(116 So. 350)
## CITIZENS' BANK OF GUNTERSVILLE v. PEARSON et al. (8 Div. 869.)

Supreme Court of Alabama. Oct. 13, 1927.

Rehearing Granted Jan. 12, 1928. Further Rehearing Denied April 5, 1928.

**1. Highways ⬥113(1)—Road building contract, plans, and specifications and surety bond, included by reference, is but one transaction to be considered together.**

Road building contract, including plans and specifications, which by appropriate reference included bond given by surety, was but one transaction, and such undertakings, when duly executed, are considered together, or are necessarily and materially related to the other.

**2. Contracts ⬥152—Persons may prescribe limitations of contract which will bind them, and their words employed will be given their ordinary and accepted meaning.**

Parties not under disability may prescribe obligations and limitations of contracts by which they will be bound, and their words employed, if unambiguous, will be given their ordinary and accepted meaning; the contrary not being indicated by the text.

**3. Highways ⬥113(5)—Contractor's surety, completing work on contractor's default, held entitled to payments as against bank loaning money to contractor.**

Road contractor's surety, completing work on contractor's default, with resultant expenditure of large sum, held entitled by specific assignment, express terms of contract, and general principles of law of subrogation to amount payable on completion of work as against bank which loaned money to contractor.

On Rehearing.

**4. Chattel mortgages ⬥152 — Surety, taking over equipment on road contractor's default without notice of unrecorded chattel mortgage, held not liable for conversion (Code 1923, § 6890).**

Surety of road contractor, taking over equipment on contractor's default on payment of certain sum and without knowledge of unrecorded chattel mortgage, held not, in view of Code 1923, § 6890, guilty of conversion, and liable in damages therefor to chattel mortgagee.

**5. Chattel mortgages ⬥136—Chattel mortgagee under unrecorded mortgage, acquiescing in another's use of mortgaged property, held estopped from recovering on ground of conversion.**

Bank having unrecorded chattel mortgage on road contractor's equipment, and acquiescing in contractor's surety taking over equipment on contractor's default, held estopped from recov-

ering from surety on ground of conversion and damage to mortgaged property.

Appeal from Circuit Court, Marshall County; W. W. Haralson, Judge.

Bill in equity by the Citizens' Bank of Guntersville against L. C. Pearson, the United States Fidelity & Guaranty Company, and others, and cross-bill by respondent United States Fidelity & Guaranty Company. From a decree denying relief, complainant appeals. Affirmed on rehearing.

Isbell & Scruggs, of Guntersville, for appellant.

A building contract or road contract is not completed until it is built or paid for. The bondsmen on such a contract, required to furnish materials and labor necessary to construct, is liable to third parties for the labor and material for such construction. Stoddard v. Hibbler, 156 Mich. 335, 120 N. W. 787, 24 L. R. A. (N. S.) 1075; Mayes v. Lane, 116 Ky. 566, 76 S. W. 399; Kiewit v. Carter, 25 Neb. 460, 41 N. W. 286; Friend v. Ralston, 35 Wash. 430, 77 P. 794; Closson v. Billman, 161 Ind. 610, 69 N. E. 449. A surety company may waive the stipulations in a bond of suretyship. 17 A. & E. Ency. Law, 528; Bank v. Johnson, 9 Ala. 622; Hodges v. Elyton L. Co., 109 Ala. 617, 20 So. 23; Reynolds v. Douglass, 12 Pet. 497, 9 L. Ed. 1171. The indemnity agreement entered into before Pearson borrowed the money from appellant to pay for the property in the mortgage is not sufficient to convey any interest in the property acquired by said Pearson. Paden v. Bellenger, 87 Ala. 575, 6 So. 351; Varnum v. State, 78 Ala. 30; Mayer v. Taylor, 69 Ala. 403, 44 Am. Rep. 522; Grant v. Steiner, 65 Ala. 499; Burns v. Campbell, 71 Ala. 288. But, if said agreement be construed as a conveyance, it was inoperative as to appellant, not having been recorded. Code 1923, § 6890. And this whether appellant's mortgage was ever placed on record. Williams v. White, 165 Ala. 336, 51 So. 559; Code 1923, § 6890; Nolen v. Farrow, 154 Ala. 269, 45 So. 183; Williams v. Vining, 150 Ala. 482, 43 So. 744; Couch v. Holmes, 151 Ala. 503, 43 So. 858. The bonding company, in taking the property covered by the mortgage, was liable in damages for conversion. Mitchell v. Thomas, 114 Ala. 459, 21 So. 991; Allen v. Jacob Dold Co., 204 Ala. 652, 86 So. 525.

Coleman, Coleman, Spain & Stewart, of Birmingham, for appellees.

The bond of appellee was included in the contract by Pearson with the county. First Nat. Bank v. Fid. & Dep. Co., 145 Ala. 335, 40 So. 415, 5 L. R. A. (N. S.) 418, 117 Am. St. Rep. 45, 8 Ann. Cas. 241. The surety company was entitled to the fund in question. 21 R. C. L. 1113; First Nat. Bank v. City Trust Co. (C. C. A.) 114 F. 529; Prairie St.

Bank v. U. S., 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412.

THOMAS, J. Only the Citizens' Bank of Guntersville appeals and assigns error. The real controversy is between the appellant and the surety company. Although the latter was made a respondent to the bill by the bank, it answered, and by cross-bill asserted its right to the fund, which was a portion of the contract money due by Marshall county to the road contractor.

It should be stated that L. C. Pearson contracted with the duly constituted authorities to build four miles of road under the direction of the state highway engineer in Marshall county. The surety company was the guarantor on the bond for the performance by Pearson of said construction contract. The bank loaned Pearson money at the beginning of his contract, and J. B. Whitaker was the comaker of the notes evidencing the loans. When Pearson defaulted on his contract, the surety company took charge of the work, and completed the contract at its own expense, and was receiving the balance of funds due Pearson under the contract when the same was diverted or collected by the bank. The suit or the original complaint asserted a prior right to the fund, by reason of its loans to Pearson and its order from Pearson to the probate judge directing the latter to deliver monthly estimates to the bank, and on Pearson's formal assignment to Whitaker of the same, for the alleged benefit of the bank, and to further secure said payments of loans. The surety company relied upon an assignment antedating the bank's order and assignment; and also on the terms of the bond itself providing that the surety company may under certain conditions take charge of the work, and the fact that it did so take charge and completed the contract, and therefore should receive the balance of the fund on hand with the county as the contract price of said work. The appellee relied upon the equitable principle that a surety duly completing the contract of its principal, is subrogated to its principal's right to receive the payments under his contract, and a right execution thereof, which was the basis of the suretyship.

The surety company further claimed that, in violation of its rights, the bank, having knowledge thereof, collected $2,327.78 belonging to the surety company, and it sought, by the cross-bill, to compel the bank to account for and repay the same.

One of the evidences of debt given by Pearson and Whitaker to the bank was, in form, a chattel mortgage on a crusher, an engine, tram cars, and rails, which Pearson was using on that road construction, and the bank claimed that the surety company converted the same or some of said property, and should be held to pay therefor. As to this,

the surety company insists that, in the beginning of the suretyship, Pearson executed a transfer and assignment of all equipment, including the crusher, engine, cars and rails to it, and that Pearson had duly surrendered said equipment to the surety company upon the latter's taking over the execution of the contract; that is to say, that its assignment prior to the bank's mortgage, and having gone into possession under the assignment before the bank's mortgage was ever recorded, and, without actual knowledge, subordinating its claim to that of the bank's, the surety company claimed a prior right to the equipment.

It follows from this the inquiries of fact are: (a) Whether the bank or the surety company had the better right to the fund. (b) If the surety company's rights were superior to the bank's, whether the latter was liable to the surety company for having collected the $2,327.78. (No appeal or assignment of error challenges the ruling as to said item of $2,327.78.) (c) Whether the surety company was liable to the bank for the conversion of the equipment on which the bank held the unrecorded chattel mortgage.

[1] As to the superior right to the fund, it will be noted that Pearson contracted with the county for building the New Hope and Guntersville road; that the contract included the plans and specifications, and the latter, by appropriate reference, included the bond that was given by appellee for the due prosecution and execution of the contract. This was but one transaction; and said undertakings, when duly executed, are considered together, or are necessarily and materially related to the other. First Nat. Bank v. Fidelity & Deposit Co., 145 Ala. 335, 40 So. 415, 5 L. R. A. (N. S.) 418, 117 Am. St. Rep. 45, 8 Ann. Cas. 241.

[2] The surety has the right to stand upon the agreement, with reference to which it entered into the contract of suretyship, and to exact compliance with the stipulations thereof; that is to say, that parties, not under disability, within the law, may prescribe obligations and limitations of contracts by which they will be bound, and their words employed, if unambiguous, will be given their ordinary and accepted meaning, the contrary not being indicated by the context. Fite v. Pearson, 215 Ala. 521, 111 So. 15.

It follows that the bank and the surety company rely upon the contract for the establishment of their respective rights to the fund, proceeding, as it did, out of the contract relations of the several parties to the common end with the state and county authorities.

[3] There was evidence showing that Pearson was a substantial contractor, not wholly dependent upon the bank for the potential existence of his ability to prosecute the work of construction, and notwithstanding the fact that shortly after commencing the work he borrowed moneys in question from the bank. The fact that Whitaker was a comaker with Pearson on said obligations to the bank may afford the basis for an inference that the loans by the bank were at the instigation of, or upon the credit of, Whitaker, or that the latter was in some wise interested in the contractor or his undertaking with the authorities.

However this may be in fact, the bank took an order (February 18, 1920) by Pearson to the probate judge of the county to "deliver to the Citizens' Bank * * * any warrants that may become due * * * for work on roads" in the county, and effective without further notice; and that, after the surety company had taken charge of, and was completing, the construction contract work, Pearson executed to Whitaker an assignment of his rights under his contract with the county.

The bank must rest its claim upon the order to the probate judge of February 18, 1920, and the assignment of November 20th to the comaker on the bank notes an assignment for its benefit, coupled with the alleged equity of the bank that the money loaned Pearson was expended in the prosecution of the work per contract in the initial conduct thereof. And we have stated that the surety company rests its claim to the fund on the assignment executed by Pearson at the inception of the suretyship, the express terms and conditions of the bond, which, by adoption, became an inherent part of the contract out of which the fund arises, and upon the principle of subrogation whereby a surety who is compelled to complete his principal's undertaking becomes entitled to receive the payment of the contract price in full when the same is executed by the surety.

On September 12, 1919, at the inception of Pearson's contract, and when the surety company signed the bond, Pearson agreed with it as follows:

"In further consideration of the execution of the said bond, I do hereby agree, *as of this date,* that the United States Fidelity & Guaranty Company shall, as surety, be subrogated to all my rights, privileges, and properties as principal and otherwise in said contract, and *I do hereby assign, transfer, and convey to said company all the deferred payments, retained percentages, and any and all moneys and properties that may be due and payable to me at the time of such breach or default, or that may thereafter become due and payable to me on account of said contract,* or on account of extra work or materials supplied in connection therewith, hereby agreeing that all such moneys and the proceeds of such payments and properties shall be the sole property of the United States Fidelity & Guaranty Company, and to be by it credited upon any loan, cost, damage, charge, and expense sustained or incurred by it as above under its bond of suretyship." (Italics supplied.)

Thus Pearson assigned to the surety company the right to the fund in question "as of this date," which was September 12, 1919, before he gave an order to the probate judge to deliver his vouchers for estimates to the bank, or before he formally assigned to Whitaker, for the benefit of the bank any interest in the contract or the proceeds thereof.

The surety company's bond was an inherent part of the contract, material to the conduct or construction of the work, and the production of the fund. It was stipulated:

"Provided, further, that upon the failure of the said L. C. Pearson to promptly and efficiently prosecute said work, in any respect, in accordance with the contract, the above bound United States Fidelity & Guaranty Company, as sureties, shall take charge of said work and complete the construction at their own expense, pursuant to its terms, receiving, however, any balance of the funds in the hands of said county due under said contract, said sureties may, if they elect so, by written direction given to said state highway engineer or said county of Marshall, Ala., authorized and require said state highway engineer or said county to complete said work according to said contract at the expense of said sureties, and such sureties hereby agree and bind themselves to pay the expenses of the completion of such work, less any funds in the hands of the county remaining due to the above bound contractor."

This was ample provision for annulment of the contract; yet it is further stated in the specifications as follows:

"The contract of which these specifications form a part, may be annulled by the State Highway Engineer for the following reasons:

"(1) Substantial evidence that the progress being made by the contractor is insufficient to complete the work within the specified time.

"(2) Deliberate failure on the part of the contractor to observe the requirements of these specifications.

"(3) Failure on the part of the contractor promptly to make good any defects in materials or workmanship that may be pointed out to him by the engineer.

"Before the contract is annulled, the contractor and his bondsmen will first be notified in writing by the state highway engineer of the conditions which make annulment of the contract imminent. Fifteen days (15) after this notice is given, if no effective effort has been made by the contractor or his bondsmen to correct the condition complained of, the state highway engineer may declare the contract annulled, and notify the contractor accordingly."

Pursuant to annulment, the accredited authority or highway engineer gave notice to the contractor of date of July 9, 1920, of the delay in the prosecution of the work and the necessity for proceeding therewith within 15 days, and in a satisfactory manner. The surety company's associate manager, Mr. Love, investigated this complaint and its duty in the premises, and found the work suspended, and intervened in the premises under its contract, and the surety company immediately obligated itself, and made payment of the bill, procured other equipment for prosecution of the contract work, proceeded with the prosecution of the same, and to that end expended a large sum therefor without full reimbursement. Thus did the surety company become entitled to the fund thereafter earned and becoming due by specific assignment, and the express terms of the contract, and by general principles of the law of subrogation, upon full discharge of the principal's obligation. 21 R. C. L. 1113; First Nat. Bank v. City Trust Safe Dep. & Sur. Co. (C. C. A.) 114 F. 529, 532.

In Prairie State Nat. Bank v. United States, 164 U. S. 227, 232, 17 S. Ct. 142, 144, 41 L. Ed. 412, 416, Judge White said of such a case:

"Under the principles thus governing subrogation, it is clear whilst Hitchcock was entitled to subrogation the bank was not. The former in making his payments discharged an obligation due by Sundberg for the performance of which he, Hitchcock, was bound under the obligation of his suretyship. The bank, on the contrary, was a mere volunteer, who lent money to Sundberg on the faith of a presumed agreement and of supposed rights acquired thereunder. The sole question, therefore, is whether the equitable lien, which the bank claims it has, without reference to the question of its subrogation, is paramount to the right of subrogation which unquestionably exists in favor of Hitchcock. In other words, the rights of the parties depend upon whether Hitchcock's subrogation must be considered as arising from and relating back to the date of the original contract, or as taking its origin solely from the date of the advance by him. * * *

"To the argument that the extra advances really went into the work and so inured to the benefit of the sureties, Lord Langdale, master of the rolls, answered as follows ([Calvert v. London Dock Co., 2 Keen, 638] page 644):

"'The argument, however, that the advances beyond the stipulations of the contract were calculated to be beneficial to the sureties, can be of no avail. In almost every case where the surety has been released, either in consequence of time being given to the principal debtor, or of a compromise being made with him, it has been contended that what was done was beneficial to the surety, and the answer has always been that the surety himself was the proper judge of that, and that no arrangement, different from that contained in his contract, is to be forced upon him; and bearing in mind that the surety, if he pays the debt, ought to have the benefit of all the securities possessed by the creditor, the question always is, whether what has been done lessens that security.'" L. R. A. 1918D, 736 note.

This is the law of the case, and further discussion is unnecessary of this phase. Donnelly's Law of Pub. Con. § 344.

There was no cross-appeal challenging the decree in its failure as to allowances to the surety company. It is therefore unnecessary to consider the rulings as to this feature of the litigation.

Thus we have noted there was no error

in ruling as to the foregoing phases of the case, and we come now to consider the alleged conversion by the surety company of the crusher, engine, cars, and rails, the subject of the bank's mortgage of date of July 7, 1920. The priority of right in the bank rests upon the chattel mortgage—not of the date of September 24, 1920, that of its record and constructive notice after the surety company had taken possession of the equipment under its bona fide claim and right given in the inception of the suretyship, but upon the requirements of the statute having application (section 6890 of the Code).

The fact that the evidence shows (witness Cheek) that the property was surrendered to, or taken over by the surety company about September 1st (appellant's counsel treats that date as being September 2, 1920, and such is Love's testimony), and without the objection of Pearson, does not authorize a decree for appellees as to these items embraced in the bank's mortgage. The letter of September 2, 1920, by Love to the bank gave information that the work was taken over and supervised by its representative Cheek for the surety company. Mr. Pearson testified of the fact that Mr. Cheek came to the work right "at the first of September—along early in the fall," and that all the "money that went into the job came from Mr. Cheek through the U. S. F. & G. Co."; "that Cheek drew upon the surety company to meet the pay rolls," did "all the buying and giving instructions, so far as the work was concerned, to Jackson, and he and witness carried the same out, and that Cheek was so acting for the company with the understanding and under the construction contract with Pearson and the state and county officials.

The fact remains that the right of the surety company to the property embraced in the mortgage to the bank, and taken over by the surety company, rests upon the unrecorded equitable mortgage or instrument in the nature thereof for indemnity to the surety company. The bank's mortgage was executed prior to the property being taken or surrendered to the surety company. The fact that last named mortgage was recorded at a subsequent date is immaterial. The statute (section 6890 of the Code) applies, and is extended to a mortgage or instrument providing indemnity, and is inoperative as effecting the right of creditors and purchasers. This phase of the court's ruling is presented for review by assignments of error 34, 37, and 38, and the case should be retried in respect to this phase of the case or respective rights of the parties growing out of the mortgaged property and the right of the surety company.

The judgment of the circuit court is reversed, and the cause is remanded.

Reversed and remanded.

ANDERSON, C. J., and SOMERVILLE and BROWN, JJ., concur.

## On Rehearing.

THOMAS, J. [4] The phase of the case now material and for further consideration is the effect of the statute (section 6890, Code) on the claim for damages for conversion of mortgaged property during the intervening time from the taking over of the execution of the work by the surety company and the record of the bank's demand note and chattel mortgage. The two instruments adverted to are: That to secure the indebtedness of L. C. Pearson and J. B. Whitaker to the bank for $5,750, due "on demand without grace," and dated July 7, 1920, recorded September 24, 1920; and that to provide indemnity to the surety company as part of the consideration for making contractor's bond, dated September, 1919, and not recorded. Each instrument is within the terms of the statute, providing, as it does, the—

"conveyances of personal property to *secure debts*, or to *provide indemnity*, are inoperative against *creditors and purchasers without notice*, until recorded."

The property in question and embraced in the mortgage was taken over from the grantor, Pearson, by the surety company, or was surrendered to it by Pearson, on September 2, 1920, under or by virtue of its bona fide claim of right and duty in the premises, to proceed with the contract, and on which date it undertook the execution of the contract, and at said time, in furtherance thereof, drew its draft for about $2,000, that was cashed or collected through appellant bank. We will set out later the written notice of such action and advancement by the surety to said bank.

Conceding that the exact terms of the indemnity agreement by Pearson to the appellee were not known to appellant, or were inoperative by reason of its non-record, as one dealing with Pearson in good faith of his ownership and parting with value and without actual notice, when the chattel mortgage note was executed, would such unrecorded mortgage be inoperative as to the appellees? The statute declares the general rule that conveyances of *personal* property to secure debts or provide indemnity are inoperative against *creditors* and purchasers for value and without notice, until recorded. Section 6890, Code of 1923; Finney v. Dryden, 214 Ala. 370, 108 So. 13. The history of this statute as to a mortgage of personal property *as a conveyance* of property is traced in Patterson & Co. v. Jones, 89 Ala. 388, 8 So. 77; Fort v. State, 1 Ala. App. 195, 55 So. 434; and the rights of him who parts with value without notice of an unrecorded mortgage as a purchaser or a subsequent creditor, is the subject of Mathis v. Thurman, 143 Ala. 558, 39 So. 360; Diamond Rubber Co. v. Fourth Nat. Bank, 171 Ala. 420, 425, 55 So. 100; Donahoo Horse & Mule Co. v. Durick, 193 Ala. 456, 69 So. 545; Hill v. Rentz, 201 Ala. 527, 528, 78 So. 881;

Grimmer v. Nolen, 146 Ala. 466, 40 So. 97; Scott v. Thomas, 211 Ala. 420, 100 So. 778; Clark v. McMurray, 214 Ala. 670, 108 So. 586; Birmingham v. Collier, 212 Ala. 655, 103 So. 839.

These record statutes, in pertinent respects, have come to us unchanged from the Code of 1852. The word "creditors" without notice under (section 6887 of the Code of 1923, or sections 1287, 1288, Code of 1852) the recording statute, as affecting conveyances of land, is held not to be creditors at large, but "judgment creditors." Ohio Life Ins. & Trust Co. v. Ledyard, 8 Ala. 866; Center v. Planters' & Merchants' Bank, 22 Ala. 743, 752; Richards v. Steiner Bros., 166 Ala. 353, 52 So. 200. On the other hand, the statute for record of personal property (section 1291, Code of 1852, and section 6890, Code of 1923) is held to protect general subsequent creditors. Mr. Chief Justice Walker said of this:

"The word 'creditors' is not to be taken with a qualification, and understood to mean 'judgment creditors.' The decision that the phrase, 'bona fide creditors,' occurring in the redemption statute, means judgment creditors, is grounded upon reasoning altogether foreign to the question here. Thomason v. Scales, 12 Ala. 309." Hardaway v. Semmes, 38 Ala. 657, 659, 660.

See Birmingham News Co. v. Collier, 212 Ala. 655, 656, 657, 103 So. 839; Jackson v. Wilson, 201 Ala. 529, 78 So. 883; Hill v. Rentz, 201 Ala. 527, 78 So. 881; Finney v. Dryden, 214 Ala. 370, 371, 108 So. 13.

Does it not follow that the chattel mortgage, given after the purchase of the outfit, without knowledge or notice of that mortgage on the part of the surety company, becomes inoperative until the record of the mortgage on September 24, 1920? The property was never theretofore pledged for the bank's loans, until security by way of the chattel mortgage or demand note of July 7, 1920, for all past loans aggregating $5,750, and for "any other sum I or we may owe the payee before this note is paid." The demand note was executed by L. C. Pearson and J. B. Whitaker. When Pearson became unable to proceed with his construction contract, the surety company, under agreement with Pearson, advanced for him several sums with which to prosecute the work, of which were those of August 21, 1920, for $715, and September 2, 1920, for $1,975, and took over the construction contract, and on September 18th, $2,375, aggregating $5,060, and purchased a drill and other equipment. This was done without knowledge or notice of Pearson's unrecorded mortgage or demand note to the bank. The cost price of the crusher outfit is fixed by Pearson as $1,401, and its actual value stated by him to be $2,000 or $2,500. If the unrecorded chattel mortgage or demand note was inoperative against appellees, without notice, the latter

cannot be held in damages for taking the property, or for its conversion and destruction, in its due subjection to its debt so presently contracted, since with Pearson's assent it was taken and used before the chattel mortgage was recorded. This results from the fact that, to the time of its record, the rights of each party rested upon the statute that gave immunity, as we have indicated.

In this connection, it is well to note that on September 2, 1920, Pearson had the legal right, cotemporaneously with the delivery to appellee of the crusher outfit, under the latter's bona fide claim and without its knowledge of the bank's claim, to procure from appellee the $1,975 for the owners' or mortgagors' benefit. This was done, and the draft collected by and through appellant bank. Thus a new relation or pledge by Pearson with the surety company was created (without notice of mortgage): The $1,975 advanced, aside from the original contract relations, the mortgaged property taken over, a new right as creditor under the statute is presented.

From this it is apparent that the bank, under its unrecorded mortgage, has no standing in this suit, under the general rule that the mere withholding of a chattel mortgage from record does not invalidate it as between the parties (11 C. J. 532, 5 R. C. L. 416, § 44), though it does postpone its effect to intervening rights of purchasers (Teat v. Chapman & Co., 1 Ala. App. 490, 56 So. 267), or creditors (Hardaway v. Semmes, 38 Ala. 656), and after-acquired lienholders (Lehman, Durr & Co. v. Van Winkle & Co., 92 Ala. 443, 450, 8 So. 870; Rike v. Ryan, 147 Ala. 497, 41 So. 959). In Dixie Grain Co. v. Quinn, 181 Ala. 208, 61 So. 886, it was declared:

"The recording of a mortgage containing a power of sale operates as notice to the world of such power, and of any title acquired by a purchaser thereunder, and hence would deprive subsequent judgment creditors and purchasers of the protection of the registration statute, though they had no actual knowledge of the foreclosure and sale under the power, although the foreclosure deed was not recorded prior to the rendition of their judgment."

The power contained in the demand note or lien is:

" * * * And empower said payee or his indorsee to take possession of and sell the same whenever he deems himself insecure, after five days' notice of time, place, and terms of sale, by posting."

The record does not disclose any execution of this power before the date of the record of the chattel lien note, and it was only after appellees had taken over the property and advanced the $1,975, and other sums, before said record, and without notice.

The question recurs: How can there have been a conversion, and resulting recoverable

damages to the bank, unless the latter had the superior title and right and that of immediate possession? The right or title and that of immediate possession in the surety company was by virtue of its advancements for Pearson, on surrender, of a sum or sums of money of more than the stated value of the property and cotemporaneously with the surrender of its possession and before record of the mortgage.

In Davis v. Erwin, 214 Ala. 341, 343, 107 So. 903, 905, the suit was at law for damages for the conversion of building material taken from a house alleged to have been wrongfully moved by defendant. The court said:

"This was the conversion count. There was evidence that plaintiff owned this lot and this house thereon, and that she had the right to the immediate possession of the house at the time of its conversion, and that the defendant converted it to his use by wrongfully taking it and removing it to his premises. This, if believed by the jury, would entitle plaintiff to recover under this count A. Booker v. Jones, 55 Ala. 266; Beall v. Folmar, 122 Ala. 419, 26 So. 1; Zimmerman v. Dunn, 163 Ala. 274, 50 So. 906; Moebes v. Garth, 210 Ala. 201, 97 So. 703."

And in Beall v. Folmar Sons & Co., 122 Ala. 414, 419, 26 So. 1, 2, is the declaration:

" 'To support an action of trover, the right of property, general or special, and possession or an immediate right of possession, must concur in the plaintiff at the time of the conversion; and to constitute a conversion, there must be a wrongful taking or a wrongful detention, or an illegal assumption of ownership, or an illegal user or misuser.' Booker v. Jones, 55 Ala. 266."

See, also, Pinckard v. Cassels, 195 Ala. 353, 70 So. 153, on conversion.

The relations of the parties are thus told by Pearson:

"Mr. Cheek represented the state as an inspector and the bonding company as agent. Any information I wanted I went to him for it; he didn't give directions to the foreman on the job that I know of, not in my presence. He gave me directions, he gave me money with which to meet the pay rolls. From the time he came there he gave me all the money that was used in the carrying on of the work, and from that time on I did not furnish any money for the carrying on of the work. Mr. Jackson made out the pay rolls; when he made them out, he just made it out on a time book, and told me and Mr. Cheek both what it was. Mr. Cheek then got the money. I didn't take any steps to get it; Mr. Cheek turned the money over to me sometimes, and sometimes he would turn it over to Mr. Jackson himself; when he turned it over to me I gave it to Mr. Jackson. * * * I moved the rock crusher that I bought from the city of Huntsville over on this job in June or July, 1920. This was the first work Mr. Jackson did after he came on the job. I bought it from the city of Huntsville the day after I got the contract. This crusher was, and its equipment were, on the job in 1920; never moved from that place until now, so far as I know."

The time when Whitaker claimed to have chained and locked the rock crusher was indicated by witness Jackson to have been after Pearson went away in February, 1921. This was long after the bona fide transactions, delivery of property and parting with value, pertinent to this inquiry.

The claim to the mortgaged property was the demand note by which the mortgagor was given the possession of the mortgaged property until the bank had brought the demand note to maturity, or exercised its right to the immediate possession. Until such time Pearson (and his assigns without notice) had the better right. Such was the case to September 24, 1920. Before that time appellee had voluntarily received the possession from Pearson, and acquired the latter's superior right in the premises. There was, therefore, no conversion of the property in taking and receiving that possession on September 2, 1920, or thereafter.

[5] There is another reason why appellant should not recover for the conversion—the acquiescence by the bank in the possession and use by the surety company's agents of the property mortgaged from September 2d to March, the time Pearson left the work. Assuming that Whitaker locked up the machinery after Pearson left in March, and that he so acted in pursuance of the bank's order, the fact of its acquiescence in the use from September to March gave opportunity for a set of circumstances to arise, and did arise, to prevent recovery for damages. All the while, from time to time, business relations were continued between the parties and large sums expended in prosecution of the work, on the assumption and relation of the parties, under the contract, and the use of Pearson's and the surety company's outfit in such work. This was sufficient to foreclose the bank's insistence for damages for conversion—use, wear, and tear to the mortgaged property.

All who dealt with Pearson had full knowledge that the relation of suretyship existed, or was chargeable with that notice under the circumstances and facts disclosed by the record. That relation, under the law, was inherent in the contract. The bank was specifically informed by Findley in December, 1919, or January, 1920. The bank's claim is predicated upon the assignment of date of February 18, 1920, and its unrecorded mortgage of July 7, 1920. It knew that Pearson was in financial difficulties; sought to cover its past, present, and future loans on July 7th, by the demand note of $5,750. The surety was notified July 9, 1920, of annulment for failure of prosecution of the work, found the same not progressing by reason of the lack of funds, agreed to furnish the same, and did so provide through appellant bank by draft

collected or cashed by it. The president of the bank admits knowledge of the presence of the surety company's agent coming there in connection with said delayed or defaulted contract; that representative was to see its cashier, Williams, who was the local representative of the surety company. With this knowledge, Williams and Zettler failed to tell such agent of its security by the unrecorded chattel note or mortgage, or of its alleged lien or claim on the crusher outfit. The surety company's agent drew $715 on such construction, on the principal, which draft was cashed and collected through appellant bank. And of this, on September 18, 1920, the alter ego of the bank wrote the surety company:

"We cashed a draft [on August 21st] on you drawn by your representative, Mr. Love, for $715 *on account of the L. C. Pearson contract bonds.*"

There was no statement to the agent of information or warning given by the bank of its loans secured by the unrecorded mortgage. When the contract was taken over, the surety company's representative wrote the bank on September 2, 1920, as follows:

"Citizens' Bank, Guntersville, Alabama—Gentlemen: Re: L. C. Pearson. Arrangements have been made to have Mr. W. T. Cheek supervise the work being done by Mr. L. C. Pearson on the highway north of the river. It will probably be necessary for Mr. Pearson to have funds with which to pay off on Saturday, and I have instructed Mr. Cheek to give Mr. Pearson a draft on us for whatever amount may be necessary. Will you have the kindness to cash for Mr. Pearson any draft, not exceeding $2,000 in amount, when properly signed by Mr. Cheek, and drawn on William A. Smith, manager, Atlanta, Ga. This authorization holds good only for the current pay roll, as I expect to be able to return to Guntersville and arrange for later payments. Thanking you for your kind attention, I am yours very truly,

"Will Love, Associate Manager."

The letter was specific—that the surety was acting, making large payments, would arrange for other or "later payments," and not one word about the unrecorded mortgage or lien securing the previous loans to the bank, or any future loans it may make to Pearson or Whitaker. This silence precluded recovery for the taking over, conversion, and use of the mortgaged property by and with the assent or acquiescence of Pearson. That is to say, when all the evidence is duly considered, there was no conversion and no wrongful taking of the mortgaged property.

ANDERSON, C. J., and SOMERVILLE, J., concur. Mr. Justice BROWN prefers to rest his concurrence alone on the facts showing there was no conversion.

Rehearing granted; judgment of reversal set aside and affirmed.