**A. C. RENT–A–CAR, INC., Plaintiff,**

**v.**

**The AMERICAN NATIONAL BANK & TRUST CO. OF MOBILE et al., Defendants.**

**The CURRY CORPORATION, Plaintiff,**

**v.**

**The AMERICAN NATIONAL BANK & TRUST CO. OF MOBILE et al., Defendants.**

**Civ. A. Nos. 4180–66, 4185–66.**

United States District Court,
S. D. Alabama, S. D.

Feb. 29, 1972.

**508**

Willis C. Darby, Jr., Mobile, Ala., for plaintiffs.

Mayer W. Perloff, Oliver J. Latour, Jr., Mobile, Ala., for defendants.

Harry S. Haginas, pro se.

PITTMAN, Chief Judge.

## FINDINGS OF FACT

1. These consolidated matters arise out of the alleged conversion by The American National Bank & Trust Company of Mobile, (Bank), Charles B. Nervine (Nervine), and Harry H. Haginas (Haginas) of numerous automobiles, specifically described in the complaints, alleged to be the property of Plaintiff corporations. In the A. C. Rent-A-Car, Inc. (A.C.) matter, Civil Action No. 4180–66, Plaintiff seeks to recover from the three Defendants on its Sixth Cause of Action for the alleged conversion of twenty-one (21) separately described automobiles. In the Seventh Cause of Action, Plaintiff seeks to recover from only Harry Haginas for the alleged conversion of ten (10) different automobiles, none of which is mentioned in the Sixth Cause of Action. In The Curry Corporation (Curry) matter, Civil Action No. 4185–66, Plaintiff seeks to recover from the three Defendants for the alleged conversion of six (6) specific additional automobiles.

2. The alleged conversions took place between July, 1963 and February, 1964. These suits were instituted in July of 1966.

3. The Bank is a National Banking Association, a corporation organized and existing under the laws of the State of Alabama, with its principal place of business in the City and County of Mobile. During the time in question the Bank financed automobiles for VIP Motors, Inc. (VIP) on a wholesale and a retail basis. The wholesale financing was done on a two party trust receipt basis through Bank's Installment Loan Department.

4. VIP is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in the City and County of Mobile and engaged in the used car business. Haginas, its President and Manager, was a citizen of the State of Alabama.

5. Nervine was an employee of the Bank holding the position of Assistant Vice President and at all times material hereto prior to November 13, 1963, he was the officer in charge of Bank's Installment Loan Department. Nervine's employment terminated in February, 1964. He was a citizen of the State of Alabama.

6. A.C. and Curry are two non-resident corporations with their principal places of business in the State of Florida and doing business at 2830 N.E. Second Avenue, Miami, Florida. Lew Adler (Adler) was the operations manager and the man second in command under Mr. B. F. Curry, the President of said corporations. Mr. Curry, although now permanently residing in Miami, Florida, spent only six months of the year in Florida and has very little knowledge of the facts in this case. All of the dealings which VIP had through Defendant Haginas with Plaintiff corporations were done almost exclusively with Adler. (Haginas had met Mr. Curry on several occasions, but there had been no dealing between them material to the issues in this case.)

7. During the latter part of 1961 or early 1962 VIP operated a used car lot in Mobile, Alabama. Through Haginas it obtained many automobiles it placed in its inventory from sources in the State of Florida; most were obtained through Adler.

In the normal course of events, Adler would give possession of an automobile selected by VIP to VIP in Miami and VIP would bring the automobile back to Mobile. Later A.C. would draw a draft on VIP for the agreed price of the automobile and forward the draft to the collecting bank in Mobile, Alabama. In the case of all automobiles involved in this lawsuit, and many others, the drafts were forwarded through a Miami bank to the American Bank in Mobile, Alabama. Inside of the drafts, A.C. would enclose the original invoice and the Florida certificate of title. When the draft was paid by VIP at the American Bank, the bank would then surrender the draft along with the invoice and certificate of title to VIP.

The American Bank, during 1962 and 1963, floor planned automobiles for VIP Motors. The floor plan arrangement consisted of a trust receipt and note. When VIP would sell the automobile, the trust receipt would then be paid off at the American Bank. The American Bank also financed retail sales for VIP. There seems to be little question, and the court specifically finds, that Adler knew VIP was selling the automobiles it obtained in Florida before they were paid for and in many cases before the automobiles were drafted upon. Defendant Bank has established to the satisfaction of the court that many automobiles were obtained by VIP, sold, and then not paid for in some cases for as much as nine months. From February or March, 1962 until November and December of that year, there existed between VIP and A.C. a float of approximately $17,500.00, i. e., VIP had delivered to it during the months of January, February and March of 1962, cars of this value which were not drafted on until October, 1962, and were not paid for until November and December 1962 and January 1963. Further, it was established to the satisfaction of the court that beginning in November and December, 1962 and continuing on up until June and July 1963, the automobiles which VIP purchased in one month were not paid for until the following month or next following month, with some few exceptions. During this time VIP was purchasing most of its cars from A.C.

8. Plaintiffs have sought to establish that the sale of automobiles by Plaintiffs to VIP were not credit sales. Plaintiffs have also sought to establish that a Florida automobile title certificate was like a deed to real estate which must be delivered before the title can pass.

9. Plaintiffs have relied upon two theories in their attempt to prove conversion. First, that the conversions took place as to certain automobiles when the Bank caused the automobiles to be seized from the possession of VIP in the detinue suit and sold by the Bank. Second, that the conversions took place as to certain other automobiles when the automobiles were placed on trust receipt documents ("floor-planned").

10. The court is unable to agree with Plaintiffs' contentions that these were not credit sales to VIP. From the dealings of the parties the court finds that the sales to VIP were credit sales and title and the right to possession passed to VIP upon delivery of the automobiles by Plaintiffs to VIP or its designee in Miami. Plaintiffs' counsel conceded in opening statement to the court that the risk of loss passed to VIP as soon as delivery was effected in Miami. The automobiles were invoiced F.O.B. Miami and Haginas testified that the risk of loss was on VIP and that VIP had insurance on the automobiles as soon as they were delivered in Miami. Adler knew that VIP was in the used car business and that the automobiles were placed on VIP's retail sales lot as soon as the car reached Mobile and were offered for sale to the general public. Yet the evidence is clear that automobiles were delivered to VIP and not drafted upon for many months, as is shown by the $17,500.00 float and general delay in paying for cars purchased by VIP referred to in paragraph 7 hereof.

11. Further, many of the automobiles which are the basis of these suits

show clearly the pattern of dealings between the parties. A.C. #3–1962 Ford Falcon 435[1], and A.C. #5–1962 Ford 071 were last in Plaintiff's possession 4/15/63 but were not drafted upon until four months later, 8/15/63. A.C. #4–1962 Ford 667 was last in Plaintiff's possession 4/13/63 and was not drafted upon for over six and a half months on 10/29/63. A.C. #7–1963 Chevrolet 993 was last in Plaintiff's possession 8/20/63 and drafted upon 10/29/63. A.C. #8–1962 Ford 859 was last in Plaintiff's possession 8/15/63 and not drafted upon for over two and a half months on 10/29/63.

12. Nine of the automobiles in the Sixth Cause of Action in the A.C. matter were never drafted upon by Plaintiff A.C. Rent-A-Car. Plaintiffs' counsel says there was not sufficient time to do so before VIP Motors, Inc. closed its doors to business. The evidence has shown the contrary. Although some of the automobiles were in Plaintiff's possession as late as 11/6/63, viz. A.C. #18–1962 Rambler 614, A.C. #20–1961 Rambler 551 and A.C. #21–1963 Chevrolet 157, there is no reason why these automobiles could not have been drafted upon immediately if these were cash sales. A.C. #1–1961 Cadillac 859, although claimed by Plaintiff to have been in its possession in November, 1963, was in VIP inventory in the early part of 1963 and was placed on a trust receipt in March, 1963. Floor plan checks made by the Bank show that the automobile was in Mobile since 3/27/63. A.C. #9–1962 Chevrolet 053 and A.C. #17–1962 Rambler 744 were last in Plaintiff's possession on 8/15/63 and 9/17/63 respectively, but were never drafted upon. A.C. #10–1957 Lincoln 98L was placed on a trust receipt dated 9/13/63 and was unquestionably on VIP's lot and on the Bank's Floor Plan Check made on 10/30/63 but was never drafted upon. The delay in drafting on these automobiles was consistent with prior dealings between the parties and

clearly substantiates the court's finding that the sale of automobiles to VIP were credit sales.

13. The court further finds that on or about November 12 and 13, 1963, Charles B. Nervine and John Feathers, employees of the Bank, and Haginas went to Miami and discussed with Adler the VIP situation in Mobile. Shortly after Nervine's return from Miami, and before the Bank took physical possession and detinued any of the automobiles in this suit, Nervine was relieved of all of his areas of responsibility at the Bank and ceased to function as an officer of the Bank.

Certainly, from the time of this November meeting, Adler knew unquestionably that the automobiles were floorplanned by the Bank. These conversion suits were filed in July, 1966. The Plaintiffs took no action to obtain possession of the automobiles or to rescind any sale thereof. Admittedly, there were certain discussions in Mobile during December, 1963, between Mr. J. Edwin Rehm representing the Bank, Haginas representing VIP, and Adler representing Plaintiffs regarding the automobiles. At this meeting, which took place before Christmas, 1963, Adler and his attorney intimated Plaintiffs would seek to detinue the automobiles in Mobile. No action was ever taken thereon by Plaintiffs. The Bank waited thereafter until February, 1964, before it filed its detinue suit against VIP. Plaintiffs did not file a claim suit or in any way seek to intervene in the detinue suit and judgment was duly entered in favor of the Bank and the automobiles were thereafter sold.

14. It is undisputed that in June, 1963, VIP had sold out of trust over $62,000.00 worth of automobiles on which the Bank held trust receipts. It is also conceded by the Bank that it tried thereafter to place all of the automobiles in VIP inventory on its floorplan and to obtain additional security

---

[1]. Automobiles are described herein by reference to its number in the complaint, year and make and the last three numbers of its serial number.

for the debt left unsecured by VIP's sale of the aforementioned automobiles which had been sold out of trust. Plaintiffs contend that the execution of trust receipts by VIP to the Bank constituted a conversion of said automobiles by said Bank. Plaintiff also contends that information was obtained from drafts sent to the Bank by Plaintiffs and this information was used to floor-plan the automobiles. The court finds that neither of these claims can be substantiated. Of the 21 automobiles in the A.C. case against the Bank, and the six automobiles in the Curry case, only one automobile, A.C. #14–1963 Chevrolet 360 (Pl. Ex. 4), was put on a trust receipt after the Bank obtained the draft thereon. All other automobiles were put on trust receipts after the automobiles arrived on VIP's lot and before the drafts arrived at the Bank.

15. Count Seven in the A.C. complaint is against Haginas only. Eight of these ten automobiles were drafted upon and four were floor-planned by the Bank without the drafts having been paid off. Two of the automobiles were not drafted upon. None of these automobiles were detinued.

16. The court finds that title, ownership and the right to possession of the automobiles mentioned in these cases was in VIP subsequent to delivery to it or its designee in Miami or within a reasonable time after the automobiles arrived in Alabama, and consequently the court finds neither the Bank, Haginas, nor Nervine converted any of the automobiles involved in this litigation.

## CONCLUSIONS OF LAW

1. This court has jurisdiction pursuant to 28 U.S.C.A. § 1332.

2. An action of trover or trover and conversion lies to recover damages for conversion by defendant to his own use of specific personal property in which, at the time of conversion, the plaintiff had a general or special property and of which he was in actual posses-

sion or to which he was entitled to immediate possession. Whitman v. Mashburn, 286 Ala. 209, 238 So.2d 709; Jones v. Americar, Inc., 283 Ala. 638, 219 So.2d 893. The right of property, general or special, and possession or the immediate right of possession must concur in the plaintiff at the time of the conversion or the action will not lie. Wood v. Citronelle-Mobile Gathering System Co., 279 Ala. 662, 189 So.2d 346; Jordan v. Henderson, 258 Ala. 419, 63 So.2d 379.

3. To constitute a "conversion" there must be a wrongful taking, or a wrongful detention, or an illegal assumption of ownership, or an illegal user or misuser. Jones v. Americar, Inc., *supra*. A "conversion" in the sense of the law of trover consists either in appropriation of a thing to the party's own use and beneficial enjoyment, or in destruction, or in exercising dominion over it, in exclusion or defiance of Plaintiff's right, or in withholding possession from Plaintiff under claim of title inconsistent with his own. Greer v. Carl Johnson Motor Co., 269 Ala. 617, 114 So.2d 907.

4. The State of Florida has not adopted the Uniform Sales Act, and generally speaking, the common law of sales is applicable to Florida sales. However, it has adopted what is known as the Florida Motor Vehicle Certificate of Title Act, Chapter 319, F.S.A., which provides in part as follows:

"319.22 TRANSFER OF TITLE.

"(1) Except as provided in §§ 319.21 and 319.28, no person acquiring a motor vehicle from the owner thereof, whether such owner be a dealer or otherwise, hereafter shall acquire a marketable title in or to said motor vehicle until he, she, or it shall have had issued to him, her or it a certificate of title to said motor vehicle; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title or an assignment of such certificate for said motor vehicle

for a valuable consideration. Except as otherwise provided herein, no court in any case at law or in equity shall recognize the right, title, claim or interest of any person in or to any such motor vehicle, hereafter sold or disposed of, or mortgaged or encumbered, unless evidenced by and on a certificate of title duly issued, in accordance with the provisions of this law."

It is the settled law of Florida, however, that the failure of a purchaser to obtain the title certificate at the time of sale does not prevent the passage of title from the seller to the buyer. Motor Credit Corporation v. Woolverton (Fla.), 99 So.2d 286, 72 A.L.R.2d 334; Grimm v. Prudence Mutual Casualty Company (Fla.), 243 So.2d 140. Therefore the fact that the certificates of title were not delivered by Plaintiffs to VIP in Miami at the time the cars were delivered to VIP, or that such were enclosed in the draft envelopes, did not prevent the passage of title to the automobile from the Plaintiffs to VIP. .

█ 5. The cardinal factor, according to the common law, upon which the passing of title between a seller and buyer depends, is the intention of the parties. McAfee v. Killingsworth (Fla.), 98 So.2d 738; Palmer v. R. S. Evans, Jacksonville, Inc. (Fla.), 81 So.2d 635; Commercial Union Insurance Co. of New York v. Padrick Chevrolet Co. (Fla. App.), 196 So.2d 235. Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intended it to be transferred, and that for the purpose of ascertaining the intention of the parties, regards shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case. 46 Am.Jur., Sales, § 413, page 585. The evidence established that (i) the automobiles were sold in Miami and there delivered to VIP or its designee; (ii) the risk of loss admittedly passed from Plaintiffs to VIP upon delivery in Miami; (iii) the automobiles were sold and invoiced "FOB Miami"; (iv) the Plaintiffs knew that the automobiles were being placed for immediate resale to the general public upon arrival on VIP's lot in Mobile; (v) there were extensive and repeated delays in drafting on and payment for the automobiles; (vi) Plaintiffs knew that the cars were being immediately taken to Alabama, a non title state, for immediate resale. These factors lead the court to conclude that the parties intended that the property in and title to the automobiles pass in Miami upon delivery to VIP.

6. The Plaintiffs have failed to maintain the burden of proof that they had such a general or special property in and to the automobiles which would entitle Plaintiffs to maintain an action of trover and further that they had the necessary possession or the immediate right to possession which would give them the right to maintain an action for conversion of the automobiles against the Bank, Nervine, or Haginas.

█ 7. Regardless of whether or not the Plaintiffs had a general or special property in the automobiles, the Defendant Nervine did nothing more than take part in the securing by the Bank of trust receipts on a number of the vehicles involved in this controversy. There is no evidence that in addition to the taking of the trust receipts he exercised any control or dominion in the property described in the trust receipts. In Jenkins v. Holly, 204 Ala. 519, 86 So. 390, it was held that since the evidence disclosed no act with respect to the control or dominion of the chattel against the true owner's rights that mere declarations of ownership with respect to the property were not a conversion and that there must be some interference with the owner's control or dominion. There was no interference with the owner's control or dominion by Nervine.

It is therefore ordered, adjudged, and decreed that judgment be, and is hereby, found in favor of the Defendants, Amer-

ican National Bank & Trust Company of Mobile, a National Banking Association, Harry S. Haginas, and Charles B. Nervine.

Costs are taxed against the plaintiffs respectively.