619 F.2d 1057
 UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation,
Plaintiff-Appellee,
v.
Ray D. BASS, as Highway Director, State of Alabama Highway
Dept., and Mrs. Melba Till Allen, State Treasurer,
State of Alabama, Defendants-Appellants.
 No. 77-3088.
 United States Court of Appeals,
Fifth Circuit.
 June 25, 1980.
 
 Lucian L. Smith, Jr., Montgomery, Ala., for Bass and Allen.
 William J. Baxley, Atty. Gen., Montgomery, Ala., for Allen.
 James W. Garrett, Jr., Watkins C. Johnston, James T. Upchurch, III, Montgomery, Ala., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before TUTTLE, VANCE and KRAVITCH, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 Two state executive officials appeal adverse money judgments for tortious conversion through erroneous disbursement of state funds by other state employees without defendants' participation or knowledge. We hold that under Alabama law an action for conversion does not lie and public officials may not be held individually liable for their subordinates' unauthorized actions. We therefore reverse the district court.
 
 I.
 
 2
 Cherokee Construction Co. (Cherokee) entered a contract with the state of Alabama to construct and to improve a public road. It furnished a performance bond and a payment bond for labor and materials with United States Fidelity & Guaranty Co. (USF&G), a Maryland corporation, as surety. Cherokee completed the construction, but was unable to pay some labor and material claims. USF&G paid $11,882.53 to satisfy those claims under its payment bond.[1] Cherokee's contract provided that the state would make progress payments for the construction and would retain five percent of each progress payment until the work was completed. USF&G's surety agreement stated that "(u)pon the completion of said contract pursuant to its terms, if any funds remain due on said Contract, the same shall be paid to said Principal or Surety." Under that provision, on November 27, 1974, USF&G notified the state highway department that it claimed an interest in the progress payment balances and retained funds, and, eight days later, it instructed the department that it should not pay any funds due on the Cherokee contract without USF&G's express approval.[2] On October 10, 1974, Cherokee sent one letter to the highway department instructing it to send the retainages to USF&G, and on October 24 it sent another letter countermanding the prior letter and asking the highway department to send the progress payment balances to Cherokee and the retained funds to a specified bank.
 
 
 3
 At all relevant times, appellant Ray D. Bass was the state highway director. Appellant Melba Till Allen became the state treasurer in early 1975 and held that office during the following events. On March 14, 1975, the Internal Revenue Service served on the state treasurer a notice of levy on Cherokee's next payment and the treasurer's office directed the highway department to deliver the next warrant to the treasurer's office. On August 20, the highway department transmitted to the treasurer's office one warrant to pay Cherokee $13,043.67 and another to pay the company $7,210.04. The department then notified USF&G of the transfer. On August 27, USF&G requested the highway department to pay it from Cherokee's contract balances for labor and materials claims; it did not specify or demand payment under the two warrants.
 
 
 4
 On September 3, the treasurer's office disbursed the balances due on those two warrants to the IRS. According to the parties' subsequent stipulations, Bass and Allen did not personally participate in and did not know about the disbursement. The state highway department employed more than five thousand persons during this period; its accounting division and legal division actually transferred the two payment warrants to the state treasurer.[3] The treasurer's office comprised approximately thirty-one employees in 1975; the deputy treasurer and subordinate employees actually disbursed the two warrants to the IRS.[4]
 
 
 5
 USF&G brought this diversity action against Bass and Allen in their individual capacities[5] for conversion and for breach of contract based on the transfer of the $13,043.67 and $7,210.04 warrants and the contract retainages to the IRS rather than to USF&G.[6] The parties submitted the case to the court on the pleadings and stipulated facts. The district court concluded that Bass and Allen had converted payment warrants in which USF&G had legal title and a right to immediate possession, and entered judgment against them for $11,882.53 plus interest and costs.
 
 II.
 
 6
 Conversion under Alabama law is "a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse" of another person's property. Ott v. Fox, 362 So.2d 836, 839 (Ala.1978). Accord, State Farm Mutual Automobile Insurance Co. v. Wagnon, 53 Ala.App. 712, 717, 304 So.2d 216, 219 (1974). "To sustain an allegation of conversion in Alabama the plaintiff must be able to show legal title and the immediate right of possession to the property in question" at the time of the alleged conversion. Thompson v. Ford Motor Credit Co., 550 F.2d 256, 258 (5th Cir. 1977). Accord, Ott v. Fox, 362 So.2d at 839. Conversion generally does not lie for money such as general funds in the state's hands, although a cause of action may arise from conversion of specific money capable of identification. Russell v. The Praetorians, Inc., 248 Ala. 576, 580, 28 So.2d 786, 789 (1947); Hunnicutt v. Higginbotham, 138 Ala. 472, 475, 35 So. 469, 470 (1903); see Lyxell v. Vautrin, 604 F.2d 18, 21 (5th Cir. 1979).[7] USF&G thus could not maintain an action for conversion of nonidentifiable funds in state accounts for progress payments and retainages. USF&G argues, however, that the two payment warrants and apparently the retained fund account were identified property to which it had legal title and a right of possession.[8] We disagree.
 
 
 7
 The district court found "sufficient legal title" in the subrogation of USF& G to the state's rights, the assignment of Cherokee's rights under the surety agreement, Cherokee's letter to the highway department ordering payment to USF& G, USF&G's letter to that department claiming payments to Cherokee, and several sections of the Code of Alabama. The letters and statutes do not in any sense confer legal title. The district court's conclusion that USF&G was subrogated to the state's rights in the progress payments and retained funds followed from the erroneous finding that USF&G met Cherokee's unpaid obligations under the performance bond rather than under the payment bond. Because USF&G acted under the payment bond, it was a creditor rather than a subrogee with respect to the state's rights in the progress payments and retainages.[9] See Aetna Casualty & Surety Co. v. United States, 435 F.2d 1082, 1084 (5th Cir. 1970); Trinity Universal Insurance Co. v. United States, 382 F.2d 317, 320 (5th Cir. 1967), cert. denied, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968).[10] We are not now concerned with the superiority of USF&G's interest as to third parties. The critical point in an action for conversion is that USF&G did not acquire legal title and a right to immediate possession when a nonidentified fund account was merely changed into specific payment warrants or was merely credited to a particular retainage account. "When there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." Lyxell v. Vautrin, 604 F.2d at 21.[11]
 
 
 8
 USF&G also did not make the required demand for identifiable money or other property.[12] Under Alabama law,
 
 
 9
 (A) demand in an action of trover (and conversion) is only necessary where the taking was rightful, and where a demand and refusal are necessary to constitute a conversion. . . . (W)here there has been a wrongful assumption of property by the defendant which is of itself a conversion, no demand is necessary before the suit is brought.
 
 
 10
 Dixie v. Harrison, 163 Ala. 304, 312, 50 So. 284, 286 (1909). Compare McRae v. Bandy, 270 Ala. 12, 17, 115 So.2d 479, 483 (1959) (wrongful acquisition) with Clay County Abstract Co. v. McKay, 226 Ala. 394, 397, 147 So. 407, 410 (1933) (rightful acquisition). The state rightfully acquired the funds that it owed to Cherokee and other claimants. USF&G, therefore, was required to make a demand for identifiable money or specific property before conversion could occur. USF&G's request for Cherokee's contract balances on August 27, 1975, was not such a demand.
 
 III.
 
 11
 A state officer is not officially or individually liable under Alabama law for the performance or nonperformance of discretionary, or judicial, acts. "Under Alabama law, an official is liable only for malfeasance and misfeasance in the performance of his ministerial duties, and is not liable in a civil action for performance of his judicial acts, even if he acts corruptly." Continental Bank & Trust Co. v. Brandon, 297 F.2d 928, 932 (5th Cir. 1962). Accord, Scott v. Ryan, 115 Ala. 587, 589, 22 So. 284, 285 (1897); see Hometrust Life Insurance Co. v. United States Fidelity & Guaranty Co., 298 F.2d 379, 385 (5th Cir. 1962). We cannot easily apply that test to the state treasurer and highway director because the fifth circuit reached contradictory conclusions as to the liability of the Alabama treasurer in two cases decided on the same day, compare Continental Bank & Trust Co. v. Brandon, 297 F.2d at 932-33, with Hometrust Life Insurance Co. v. United States Fidelity & Guaranty Co., 298 F.2d at 384, 386, and the Alabama courts have not clarified the law on that point. We need not reach the issues whether Bass and Allen acted judicially or ministerially and whether they exercised the requisite degree of care, however, because we conclude that USF&G has not proved that they actually authorized or participated in the transfer of the progress payment warrants and retained funds to the IRS.
 
 
 12
 The Alabama supreme court has said that a public "officer is not liable for the defaults and misfeasances of his clerks or assistants, even though they are appointed by him and are under his control, in the absence of allegation and proof that the officer was negligent or at fault in failing to exercise proper care and prudence in selecting the assistant or clerk, or in failing to properly supervise and superintend the acts and services of such employe(e) . . . ." State v. Kolb, 201 Ala. 439, 440, 78 So. 817, 818 (1918). Accord, Franks v. Thompson, 59 F.R.D. 142, 144-45 (M.D.Ala.1973). An official must "direct or otherwise participate in" conduct of his subordinates, or act negligently in selecting them, before the official may be held officially or individually liable for their actions.[13] Id. at 145. See also Williams v. United States, 353 F.Supp. 1226, 1233 (E.D.La.1973). The district court did not find and the record does not indicate that Bass or Allen personally authorized or participated in the transfer of the warrants and the retainages to the IRS.
 
 
 13
 The district court instead ruled as a matter of law that the highway director has a nondelegable duty to authorize fund transfers, such as the challenged one, to the state treasurer because Alabama law provides, "All the powers, authority and duties vested in the highway department shall be exercised by the highway director." Ala.Code § 23-1-21 (1975). The court concluded that "Bass is responsible for the acts of his subordinates" even if the actions in fact were "taken by his chief accountant." That approach misconstrues the cited statute, however, because the statute neither requires the highway director to make every decision and approve every transaction in a five thousand employee department nor prevents him from delegating some of those decisions. Instead, the statute authorizes the director to appoint the assistants and personnel necessary to carry on the department's work. Id § 23-1-33. For example, it specifically establishes the position of a chief engineer that must post bond "for the faithful performance of his duties." Id. § 23-1-22.[14]
 
 
 14
 The trial court also held that the state treasurer has a nondelegable duty to review fund transfers, apparently under the statutory provision that the treasurer is required "(t)o have custody of, and to keep safe, all moneys, bonds, mortgages and other securities required or permitted by law to be deposited with the state." Id. § 36-17-3(9). The district court again misconstrued the import of the statute, which lists fifteen other duties in the same section. The same law authorizes the state treasurer to employ a chief clerk and other assistants and requires a bond of them for faithful performance of their duties. Id. § 36-17-4. The bond would be unnecessary if the treasurer were legally responsible for any misfeasance, malfeasance, or nonfeasance. Because the law permits the relevant duties of the highway director and state treasurer to be delegated to subordinate officials, Bass and Allen are not officially or individually liable for any wrongful actions of the public officers that actually transferred the payment warrants and retained funds to the treasurer's office, then to the IRS. We do not intimate any view as to whether a state official may be held individually liable under Alabama law for actual negligent conduct in performance of official duties. See generally Allman v. Hanley, 302 F.2d 559, 561 (5th Cir. 1962).[15]
 
 
 15
 REVERSED and REMANDED.
 
 KRAVITCH, Circuit Judge, dissenting:
 
 16
 I respectfully dissent. I would affirm on the basis of Memorandum Opinion of the District Judge (Frank M. Johnson, Jr.) which is herewith reproduced.
 
 
 17
 IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
 
 DISTRICT OF ALABAMA, NORTHERN DIVISION
 UNITED STATES FIDELITY AND )
 GUARANTY COMPANY, a )
 
 18
 corporation, )
 
 
 19
 )
 
 Plaintiff, )
 
 20
 )
 
 
 21
 vs. ) CIVIL ACTION NO. 76-189-N
 
 
 22
 )
 
 RAY D. BASS, as Highway Director, )
 State of Alabama Highway Department; )
 MRS. MELBA TILL ALLEN, as State )
 Treasurer, State of Alabama, )
 
 23
 )
 
 
 24
 Defendants. )MEMORANDUM OPINION
 
 
 25
 FRANK M. JOHNSON, Jr., District Judge.
 
 
 26
 This is a suit for breach of contract and for conversion. The facts have been stipulated. On January 19, 1973, Cherokee Construction Company (Cherokee) and the State of Alabama (the State) entered into a contract for construction on Project No. EHS-S-SU-SUG-3009(101) Prop. B., involving construction and improvement on a Franklin County road. Pursuant to the requirements of title 50, section 9 of the Code of Alabama, Cherokee furnished a performance bond and a bond for payment of labor and material. This bond was executed on January 3, 1973, with United States Fidelity and Guaranty Company (USF&G) as surety, Cherokee as principal and the State as obligee. Sometime in the latter part of 1974, Cherokee defaulted on its contract with the State, resulting in USF&G having to pay $11,882.53 in labor and material claims which Cherokee had failed to pay. On five separate occasions prior to payment of the final balances due on the contract, Cherokee contacted the State Highway Department regarding disposition of the balance due on the contract. These letters instructed variously that the final checks be made payable jointly to First State Bank of Oxford[1] and Cherokee, that they be sent to First State Bank of Oxford, that they be made payable jointly to Cherokee and USF&G, that they be sent to USF&G, and, finally, the last letter, which purported to cancel all previous instructions, instructed that the checks be made payable to Cherokee but that they be sent to First State Bank of Oxford.
 
 
 27
 By letter dated November 27, 1974, James J. Smith, Supervisor of the Claims Department for USF&G, notified the Highway Department that USF&G claimed an interest in and was entitled to the retainage and unpaid balances on Cherokee's contract with the State. On December 5, 1974, a second letter from Smith to the Highway Department was sent by registered mail. The text[2] indicates that USF&G was assuming its obligations under its bonds and instructed that no payments were to be made from funds due on the contract between Cherokee and the State without the express approval of USF&G.
 
 
 28
 On January 6, 1975, Agnes Baggett, then State Treasurer, received a "Notice of Levy" from the Internal Revenue Service (IRS). This levy was dated January 2, 1975, and was in the amount of $47,454.68. The levy was for taxes assessed on September 2, 1974 and on December 30, 1974.[3] Baggett notified the Highway Department by letter written January 6, 1975, of the levy and directed that the next warrant to be issued to Cherokee be delivered to the Treasurer's office. During this period, Melba Till Allen replaced Baggett as Treasurer.
 
 
 29
 On March 5, 1975, the Highway Department transmitted to the Treasurer's office warrants 120375 and 120376 for $2,836 and $2,112, respectively, dated January 23, 1975, and made payable to Cherokee Construction Company. These warrants represented progress payments. In the transmittal letter, the Highway Department notified the Treasurer's office that USF&G and First State Bank of Oxford also claimed an interest in the warrants. A copy of this letter was sent to USF&G to alert it to the action being taken in regard to this money.
 
 
 30
 On March 18, 1975, Allen received a second "Notice of Levy" from the IRS. This notice carried the same identifying number but was in the amount of $57,921.38. This notice included the assessments in the first notice and added taxes assessed March 17, 1975, and March 26, 1973. Allen notified the Highway Department of the levy and directed that the next warrant to be issued on the Cherokee contract be forwarded to the Treasurer's office. On August 20, 1975, the Highway Department transmitted to Allen warrants 355660 and 355659 for $7,210.04 and $13,043.67, respectively, dated August 20, 1975, and made payable to Cherokee Construction Company. These warrants were for "Estimate No. 15 Final" and "Estimate No. 19 Final." Again, the Highway Department sent a copy of this letter to USF&G notifying it of the action being taken.
 
 
 31
 By letter dated August 27, 1975, USF&G requested the Highway Department to pay sufficient of the contract balances to USF&G to satisfy unpaid labor and material claims. This was not done. By letter dated September 3, 1975, Allen forwarded the balances owed on the Cherokee contract (represented by warrants 355660 and 355659) to the IRS.
 
 
 32
 This action was commenced on May 14, 1976. Jurisdiction is based on diversity with the amount in controversy exceeding $10,000 exclusive of interest and costs. By motion to dismiss, Bass and Allen attempted to assert a defense of sovereign immunity. Although the style of the case indicates that the defendants are being sued in their official capacity, such is not the case. Upon plaintiff's representation that the suit was against the defendants in their individual capacity and that the words "as Highway Director" and "as State Treasurer" in the style of the case were "merely descriptive" the Court denied defendants' motion to dismiss based on sovereign immunity. See, e. g., Finnell v. Pitts, 222 Ala. 290, 132 So. 2 (1930); Comment, To Catch the Elusive Conscience of the King: The Status of the Doctrine of Sovereign Immunity in Alabama, 26 Ala.L.Rev. 463, 469-71 (1974).
 
 I. The Contract
 
 33
 Paragraph one of the contract between Cherokee and the State provides that Cherokee "promises and agrees to furnish and deliver all the material and to do and perform all the work and labor required to be furnished and delivered, done and performed in and about the improvement and construction" on the highway specified in the contract. The following provisions are contained in the "Standard Specifications for Highways and Bridges" (Standard Specifications) issued by the State Highway Department and incorporated by reference into the contract between the State and Cherokee:[4]
 
 
 34
 4.01 INTENT OF CONTRACT. The intent of the contract is to provide for the construction and completion of every detail of the work described. The Contractor shall furnish all labor, materials, equipment, tools, transportation and supplies required to complete the work in accordance with the plans, specification, and terms of the contract. (Emphasis added).
 
 
 35
 8.04(b) PROSECUTION OF WORK. General. The Contractor shall prosecute the work continuously and diligently in the order and manner set out in his schedule or prescribed by the Engineer. He shall provide sufficient satisfactory materials, labor, and equipment to insure that the work will be completed in a satisfactory manner within the time specified in the contract. (Emphasis added).
 
 
 36
 Section 3.05 of the Standard Specifications requires that the contractor furnish a performance bond and a bond for materials and labor. The performance bond must be in the amount of 100 percent of the contract bid price. The labor and materials bond is to be for 50 percent of the contract bid price and obligates the contractor to promptly pay all persons furnishing labor or materials used in performing the contract work. Section 3.05(b) of the Standard Specifications provides:
 
 
 37
 (T)he bidder to whom the award is made shall, within . . . 10 days, execute and file with the Director (of the State Highway Department) an acceptable surety bond payable to the State in an amount not less than 50 percent of the contract bid price, with the obligation that the Contractor shall promptly make payment to all persons furnishing him or them with labor, materials, feed stuffs, services, insurance, bond, or reasonable attorneys fees, incurred by successful claimants or plaintiffs in suits on said bond. (Emphasis added).
 
 
 38
 A default is defined in section 8.12 and includes a catchall provision for "any other cause whatsoever." It is admitted by all parties that Cherokee's failure to pay the material and labor claims constituted a default. Once this default occurred, USF&G became obligated under its labor and material bond to pay these claims. But in addition, since the obligation to pay labor and material claims promptly was part of the contractual obligation undertaken by Cherokee in its contract with the State, Cherokee's default also obligated USF&G on its performance bond.[5] USF&G's performance bond provided that "upon the failure of (Cherokee) to promptly and efficiently prosecute said work, in any respect, in accordance with the contract, the above bound (USF&G) as Surety, shall take charge of said work and complete the contract at their own expense, pursuant to its terms, receiving, however, any balance of the funds in the hands of said State due under said contract." (Emphasis added).
 
 
 39
 The contract called for a portion of each progress payment or estimate to be withheld until a total "retainage" of five percent of the contract amount was collected. This retainage would be withheld "until the work is satisfactorily completed and approved by the Department as to the fulfillment of all of the provisions of the bonds therein."[6] Section 9.12 provides that "(a)fter approval of such final estimate (prepared by the Engineer) by the Contractor, he will be paid the entire sum found to be due after deducting all previous payments and all amounts to be retained or deducted under the provisions of the contract."
 
 II. The IRS
 
 40
 The IRS levy was made pursuant to section 6331 of the Internal Revenue Code.[7] This section allows the IRS to levy against the property or rights in property of a taxpayer who fails to pay an assessment. Section 6321 creates a lien in favor of the United States upon the property or rights in property of a person who fails to pay any tax after demand has been made by the Government.[8] But as the Supreme Court has stated, " § 3670 (now section 6321) creates no property rights but merely attaches consequences, federally defined, to rights created under state law." United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958). It is "State law (that) creates legal interests and rights." Morgan v. Commissioner, 309 U.S. 78, 80, 60 S.Ct. 424, 426, 84 L.Ed. 585 (1940). Section 6331 provides the means by which the United States enforces its lien for unpaid taxes. The right to levy applies even when the taxpayer's property is in the hands of another. The only exception is "property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process."[9] Although under section 6322 the lien arises at the time the assessment is made by the United States,[10] section 6323 provides that "(t)he lien imposed by section 6321 shall not be valid against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate."[11]
 
 
 41
 In order for USF&G to recover against Bass and Allen, it must show that the property turned over to the IRS did not belong to Cherokee but that it, in fact, belonged to USF&G; in other words, USF&G must show that its title to the warrants was superior to Cherokee's and that it had an immediate right of possession at the time of the alleged conversion. These two elements, title and the right to immediate possession, constitute the heart of a claim for conversion under the law of Alabama. See, e. g., Thompson v. Ford Motor Credit Co., 550 F.2d 256 (5th Cir. 1977); Whitman v. Mashburn, 286 Ala. 209, 238 So.2d 709 (1970). Unless USF&G can show that it had title to the retainage, either general or special, at the time the taxes were assessed, Bass and Allen will prevail. This is because the IRS' lien attaches to any property or rights to property belonging to the taxpayer at the time the assessment is made. Therefore, if all that USF&G had was a claim to Cherokee's property, then the IRS's lien would attach. The lien fails only if there is no property to which it can attach (or if the property has been attached pursuant to judicial process). However, it is not enough for recovery by USF&G that it prove a superior claim to the contract balances; USF&G must prove both a property interest, general or special, and the right to immediate possession. See part IV of this opinion.
 
 
 42
 As a preliminary matter, the first of Allen's three defenses may be disposed of at this point. Allen contends that pursuant to section 6332(a) she was under an affirmative obligation to turn over the warrants in question to the IRS. This is incorrect because it assumes the argument. Section 6332(a) requires one in possession of property or rights to property subject to levy upon which levy has been made to turn such property over to the IRS. Violation of this section subjects one to liability equal to the value of the property not surrendered limited by the amount of the tax assessment.[12] In addition, a civil penalty in an amount equal to 50 percent of the amount recoverable may be assessed against a person refusing to surrender property.[13] The obligations and liabilities under section 6332 apply only to persons "in possession of . . . property or rights in property subject to levy . . . ." Property subject to levy is that "belonging to (a person liable to pay any tax who neglects or refuses to pay such tax) or on which there is a lien provided in this chapter."[14] The ultimate issue in this litigation is who had title to the warrants subsequently forwarded by Allen to the IRS. If USF&G's title was superior, then there was no property or rights to property of Cherokee on which the IRS could levy. Therefore, Allen would be unable to come within the protection of section 6332(d) because she would have turned over property to the IRS belonging not to the delinquent taxpayer, Cherokee, but, instead, belonging to USF&G. Conversely, if the property belonged to Cherokee such that the IRS's levy was proper then there can be no conversion and Allen would have no need of section 6332(d)'s protection.
 
 III. Titles, Equities, Priorities
 
 43
 Resolving questions of titles, equities and priorities with regard to the property upon which the United States levied requires an examination of both state and federal law. As noted by the Supreme Court in Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960):
 
 
 44
 The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had "property" or "rights to property" to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that "in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute." . . . Thus, as we held only two Terms ago, Section 3670 (now section 6321) "creates no property rights but merely attaches consequences, federally defined, to rights created under state law . . . ." United States v. Bess, 357 U.S. 51, 55, (78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135). However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's "property" or "rights to property."
 
 
 45
 363 U.S. at 513-14, 80 S.Ct. at 1280 (footnotes and citations omitted). For USF&G to prevail under its conversion theory, it must show more than a superior lien on or claim to property owed to Cherokee. It must prove that it had title to the property. Thompson v. Ford Motor Credit, supra ; A. C. Rent-A-Car, Inc. v. American National Bank & Trust Co., 339 F.Supp. 506 (S.D.Ala.1972), aff'd, 477 F.2d 564 (1973); Jones v. Americar, Inc., 283 Ala. 638, 219 So.2d 893 (1969). Therefore, if USF&G is to succeed, it must win on the threshold question by showing that Cherokee had no property on which the government's levy could attach. USF&G asserts two theories. First, it claims that by operation of the law of subrogation it acquired rights superior to those of the government to the warrants in question. Second, it claims the warrants by operation of its surety contract "with the State." Plaintiff's Reply Brief at 3. Because the two issues are inextricably wound together, the discussion that follows will not attempt to segregate them.
 
 
 46
 Subrogation is an equitable doctrine having its origins in the civil law. A landmark in this area of the law is the Supreme Court's decision in Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), in which a surety for the builder and a bank both claimed the retainage being held pending final approval of the construction. The builder, in consideration for advances made by the bank, assigned its interest in the final payment under the contract to the bank. Without knowledge of this assignment, and after the builder had defaulted, the surety completed the contract, incurring expenses in an amount greater than that being withheld as retainage. The Court held that the surety was entitled to subrogation and went on to define the right as follows:
 
 
 47
 Hitchcock's (the surety) right of subrogation, when it became capable of enforcement, was a right to resort to the securities and remedies which the creditor (the United States) was capable of asserting against its debtor Sundberg & Company (the builder), had the security not satisfied the obligation of the contractors, and one of such remedies was the right based upon the original contract, to appropriate the ten per cent retained in its hands. If the United States had been compelled to complete the work, its right to forfeit the ten per cent, and apply the accumulations in reduction of the damage sustained, remained. The right of Hitchcock to subrogation, therefore, would clearly entitle him, when, as surety, he fulfilled the obligation of Sundberg & Company, to the government, to be substituted to the rights which the United States might have asserted against the fund. . . . That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work as for him for whom the work is to be performed; that it raises an equity in the surety in the fund to be created . . . is amply sustained by authority.
 
 
 48
 164 U.S. at 232-33, 17 S.Ct. at 144. The rule of Prairie State Bank has been followed in Alabama. See, e. g., State of Alabama v. Bessemer Materials, Inc., 224 F.Supp. 182 (N.D.Ala.1964); Maryland Casualty Co. v. Dupree, 223 Ala. 420, 136 So. 811 (1931); Citizens' Bank of Guntersville v. Pearson, supra.
 
 
 49
 The doctrine of subrogation applies to sureties who have paid a debt due to a third party for which another was primarily liable. Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Prairie State Bank v. United States, supra. The requirements for application of the doctrine are that the party seeking subrogation must have paid a debt due a third party and that in paying the debt the party is acting on compulsion and not as a volunteer. Prairie State Bank v. United States, supra, 164 U.S. at 231, 17 S.Ct. at 144.
 
 
 50
 The question to which the Court now turns relates to the identity of the party to whom the surety is subrogated. When the surety pays the creditor, it is subrogated to the rights of that creditor. In the situation where the surety completes the contractor's obligations under the contractor's contract with the owner (the State), there are two creditors which are being "paid." The most obvious creditor in the situation now before the Court is the laborer or materialman whose claim USF&G paid. But in this situation, the State, as owner, is also a creditor in that under its contract with Cherokee it is owed the promised performance, part of which was the prompt payment of labor and material claims. Therefore, when USF&G undertook performance of that obligation, it became subrogated to the rights of the State, which included the right to apply the withheld retainage to those claims. This is the rule announced in Henningsen v. United States Fidelity & Guaranty Co., and Prairie State National Bank v. United States. As has been pointed out, this is also the rule followed in Alabama. In Maryland Casualty Co. v. Dupree, supra, the Alabama Supreme Court held that the rights of the surety to the retainage on a contract between a builder and a local school board to build a school were superior to those of an assignee of the contractor.[15]
 
 
 51
 The surety on Clark's (the contractor) public improvement bond was conditioned for the faithful performance of the contract and the payment of all claims for labor and materials, and such surety had the right to have payments made by the school board to appellees from the proceeds of the specific contract to be applied in payment for materials furnished under that contract. . . .
 
 
 52
 After appellant (the surety) had paid all the demands for labor and material (except such demands of appellees) out of the $3,694.25 received by appellant from the board of education, the balance remained in its hands.
 
 
 53
 223 Ala. at 424 & 425, 136 So. at 813, 815. In other words, the surety owned the retainage. The Alabama court quoted the following passage from the Henningsen case:
 
 
 54
 "Henningsen . . . entered into a contract with the United States to construct buildings. The Guaranty Company was surety on that contract. Its stipulation was not merely that the contractor should construct the buildings, but that he should pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for. He did not make this payment, and the Guaranty Company, as surety, was compelled to and did make the payment. Is its equity superior to that of one who simply loaned money to the contractor, to be by him used as he saw fit, either in the performance of his building contract or in any other way? We think it is. It paid the laborers and material-men, and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers and supplymen were paid. It did this not as a volunteer, but by reason of contract obligations entered into before the commencement of the work."
 
 
 55
 208 U.S. at 410, 28 S.Ct. at 391. The Alabama court then noted that this is the rule in Alabama. Under the Erie doctrine this Court must follow Alabama's law.
 
 
 56
 Professor Corbin has explained the rationale for the foregoing principle in his treatise on contracts.
 
 
 57
 . . . If the surety claims by subrogation, his claim is not a "latent equity" for the reason that he is being put into the position of the obligated owner, none of whose defenses and counterclaims can be described as "latent."
 
 
 58
 The owner, in such a case as the above is both an obligor and an obligee. His duty to pay is accompanied by a right to the performance promised in exchange for his money; his duty to pay is conditional upon performance of the builder. . . . In so far as the agreed exchange has been performed at the surety's expense under the compulsion of the surety bond, it has seemed fair and just to give to him that part of the payment that is dedicated to the agreed exchange; and it has seemed unjust to let either the contractor or his assignee profit by the performance rendered under compulsion by the surety. This is the doctrine of subrogation of the surety to the position of the creditor. For, again be it noted, although the owner is a debtor (obligor) as to the promised payment, he is a creditor (obligee) as to full performance by the building contractor, and deferred payments are retained by him as a security for such performance.
 
 
 59
 . . . So, when the surety performs any of the contractor's duties to the owner, he is subrogated to the owner's rights and securities against the principal contractor; and among these are included the deferred payments and retained percentages in the owner's hands.
 
 
 60
 4 Corbin on Contracts § 901, at 609, 610 (1951).
 
 
 61
 The contract under consideration is clear in providing that the State may use the retainage to pay for any costs and expenses incurred in completing the contract upon default by the contractor.[16] When USF&G took over this obligation upon default by the contractor it became subrogated to the rights of the State to the retainage.
 
 
 62
 The issue has now boiled down to a question of whose rights were superior, USF&G as subrogee of the State or the IRS, standing in the shoes of Cherokee. If Cherokee owned the property or had rights to the property (the monies owed on the contract) at the time of the assessment, then its lien attached. But if Cherokee did not own the property or rights therein, then there was nothing to which the lien could attach. The Court concludes that, at the time the assessments were made by the IRS, Cherokee had no right to the contract monies, that USF&G was entitled to these funds and that defendants, by paying the monies to the IRS, converted property owned by USF&G to which it had an immediate right of possession.
 
 
 63
 Priority fights between the IRS and sureties over retainages are not new either to the federal courts or to Alabama. USF&G places substantial reliance on United States v. Commonwealth of Pennsylvania, 349 F.Supp. 1370 (E.D.Pa.1972), in which the court held that a defaulting contractor had no property or rights to property in the retained balances on its contract with the State of Pennsylvania to which the Government's lien for taxes could attach.
 
 
 64
 In short, when O'Brien and Redmond (the contractor) failed to pay labor and material claims, thus breaching its contract with State, Hanover and Globe (the sureties) become (sic ) legally liable for the payment of the labor and materialmen and they were thus subrogated to the rights in the fund to the extent of the payments made by them to the various claimants. These rights of the surety were superior to any rights of any other creditor of the bankrupt and related back to the date of the construction contract with State. We agree with the court in Atlantic Refining Co. (Atlantic Refining Co. v. Continental Casualty Co., 183 F.Supp. 478 (W.D.Pa.1965)) which said:
 
 
 65
 In the instant case, I conclude that the Contractor had no "property" or "rights to property" in the withheld balance which the Owner paid into court, and, therefore, there was nothing to which the government's lien could attach.
 
 
 66
 349 F.Supp. at 1387-88, quoting Atlantic Refining Co. v. Continental Casualty Co., 183 F.Supp. at 483.
 
 
 67
 The same result has been reached in two cases from the Northern District of Alabama, involving priority fights between sureties and the IRS over retainages. State of Alabama v. Bessemer Materials, Inc., supra ; Alabama-Tennessee Natural Gas Co. v. Lehman-Hoge & Scott, 122 F.Supp. 314 (N.D.Ala.1954). Both cases were interpleader actions in which the contractor had defaulted. In the Alabama-Tennessee case, the surety was forced to pay material and labor claims upon default by the contractor, who had gone into bankruptcy. After completion of the contract, there was an "overage"; in other words, there were funds remaining. The question was to whom should these funds be paid. Both the surety and the IRS claimed superior rights to the money, the IRS on the basis of its lien for taxes and the surety by virtue of its payment of labor and material claims. In addition, an assignee of the contractor claimed an interest in the funds. The court held that the rights of the surety were superior to those of the Government as well as to the other claimants. The court's rationale was as follows:
 
 
 68
 A surety who makes good under his contract of suretyship, upon default of the principal contractor, acquires an equitable lien upon the unpaid balance in the hands of the person in whose favor the bond runs, and such equitable lien, upon payment by the surety, relates back to the date of the contract of suretyship, although prior to the date of payment by the surety. . . .
 
 
 69
 The surety's right to funds in the hands of the obligee (the owner), to the extent of the amount the surety is compelled to pay under the bond, is superior to the contractor's right to such funds, and superior to the right of the United States to such funds. The rights of the government could be no greater than those of the contractor.
 
 122 F.Supp. at 319.[17]
 
 70
 In Bessemer Materials, the contractor had contracted with the State of Alabama for the construction of a road in Walker County. The contractor defaulted whereupon the surety took over performance of the contract. The contractor had executed the required performance and labor and material bonds. Prior to completion of the contract, the United States had served the State with a notice of levy for unpaid taxes by the contractor. Upon completion of the contract the State had possession of a portion of the contract balances which were due. Since both the surety and the Government were claiming an interest in the same funds, the State filed an interpleader action, depositing the money into court. The court made the following conclusions of law:
 
 
 71
 1. USF&G has a prior and superior right to the funds to be paid into the registry of this Court by the State of Alabama. . . .
 
 
 72
 2. When Bessemer Materials defaulted and USF&G as surety took over and completed the performance of the contract project and paid all unpaid claims due subcontractors, laborers and materialmen, then all remaining sums due under the contract, up to the amount expended by said surety, were due and owing by the State of Alabama to USF&G and Bessemer Materials had no property or right to property in these contract funds upon which any lien of the United States or of the State of Alabama for taxes could attach. . . .
 
 
 73
 3. USF&G by virtue of its equitable right of subrogation, its conventional right of subrogation, its specific assignment of August 26, 1960 (contained in the application for surety bonds which the contractor executed), and the provisions of its contract as surety with the State of Alabama, has a prior and superior right over all other claimants herein to the funds to be paid into the registry of the Court by the State of Alabama and is entitled to receive such funds. . . .
 
 
 74
 224 F.Supp. at 183-84.
 
 
 75
 In the present case, the contract between Cherokee and the State was executed January 19, 1973. USF&G's bonds were executed January 3, 1973. The earliest assessment for which the IRS sent its notices of levy was dated March 3, 1973, which was prior to the time USF&G notified the State that it claimed an interest in the retainage to the extent of the material and labor claims which it paid but which was subsequent to execution of the contract and the bonds. Under the holding of Alabama-Tennessee, the surety's claim relates back to the date of the contract of suretyship. Even if this were not so, the 1973 assessment was only for $2,680.62. There were sufficient funds to pay both the 1973 assessment and USF&G's claim.
 
 
 76
 The next assessment for which the IRS sent a notice of levy was dated September 2, 1974, after USF&G notified the State of its claim. Upon completion of the contract to the satisfaction of the State, USF&G, not Cherokee, was owed the retainage. The Court concludes that USF&G had done everything necessary to receive payment of $11,882.53,[18] that USF&G was owed this money, and that USF&G had an immediate right to possess the money at the time the warrants were issued. Although the Court concludes that Bass and Allen wrongfully withheld the contract balances from USF&G, the Court now must decide whether these actions by the defendants will sustain an action for a conversion and whether Bass and Allen, or either of them, have available a defense to their actions that would bar recovery by USF&G.
 
 
 77
 The Court notes in passing that the defendants had available a procedure to settle the conflicting claims to the monies which would not involve the risk of converting them an interpleader action, used by the State in the Bessemer Materials case in a situation almost identical to the one facing Bass and Allen at the time they converted the funds.
 
 IV. The Conversion
 
 78
 Under Alabama law, in order to maintain an action for conversion, the plaintiff must prove (1) a general or special title to the property converted; (2) possession or the immediate right of possession, and (3) some act of dominion over the property inconsistent with plaintiff's title and right of possession. See, e. g., Jordan v. Henderson, 258 Ala. 419, 63 So.2d 379 (1953); Hamilton v. Hamilton, 255 Ala. 284, 51 So.2d 13 (1951); American Standard Life Insurance Co. v. Johnson, 231 Ala. 94, 163 So. 632 (1935); Warren v. Peppers, 31 Ala.App. 394, 17 So.2d 585 (1944). Although there are cases in which it is said that, in order to maintain an action for conversion, the plaintiff must have "legal title,"[19] an examination of the cases from the Alabama courts clearly indicates that legal title is not a strict requirement and that in certain situations no title at all is required. See Hamilton v. Hamilton, supra; Forbes & Carloss v. Plummer, 198 Ala. 162, 73 So. 451 (1960); Farrow v. Wooley & Jordan, 149 Ala. 373, 43 So. 144 (1907); Montgomery Gas-Light Co. v. Montgomery & Eufaula Railway Co., 86 Ala. 372, 5 So. 735 (1888); Hare v. Fuller, 7 Ala. 717 (1845); T. and W. Brandon v. Planters & Merchants' Bank, 1 Stew. 320 (1828); Warren v. Peppers, supra ; Crescent News & Hotel Co. v. Hines, 7 Ala.App. 609, 61 So. 9 (1913). But see Thompson v. Ford Motor Credit Corp., supra ; Hodges v. Westmoreland, 209 Ala. 498, 96 So. 573 (1923). It has been held that a bailee has a sufficient property interest to maintain a suit for conversion. See, e. g., Farrow v. Wooley & Jordan, supra ; Montgomery Gas-Light Co. v. Montgomery & Eufaula Railway Co., supra. In Forbes & Carloss, the court was faced with the situation in which an agent or officer arguably had purchased property for his employer in the employer's name. The court stated in dictum that the agent had sufficient title to maintain an action for trover in his own name: "If it could be contended or found that he purchased as an agent or an officer of the lumber company, and not as an individual, still he acquired such rights as would support trover against one who subsequently converted the property." 198 Ala. at 166.
 
 
 79
 In Hamilton v. Hamilton, the husband had assigned various insurance policies to his wife with the condition that she was to receive the benefits of the policies if she outlived him. The court found that the "effect of such assignment was to vest the title to the policies in the wife, subject to divestment on the happening of a contingent event, the death of the wife prior to that of the husband." 255 Ala. at 290, 51 So.2d at 19. In reaching this result, the court relied on Conyne, Stone & Co. v. Jones, 51 Ill.App. 17 and quoted extensively from the Illinois decision. The Illinois court held that the effect of an assignment such as faced the Alabama court was as follows: "We think the right of property in this policy was in Lucinda M. Jones, with only the naked legal title in her husband, Gabriel S. Jones." The Alabama court held that the assignment by the husband operated to vest sufficient title in the wife to maintain an action for conversion. 255 Ala. at 291, 51 So.2d 13.
 
 
 80
 In T. and W. Brandon v. Planters and Merchants' Bank, the court held that the finder of lost property had sufficient title to sustain an action for trover.
 
 
 81
 But I think found property is to be viewed in a light somewhat different from absolute general property, or special property in the usual acceptation of the term. I am of opinion that the finder . . . is the apparent general owner of the property under an uncertain or contingent title; one that may be defeated by the discovery of the owner or loser, if he has not abandoned the same . . .. Special property in the general acceptation, and as referred to in the cases cited, presupposes an absolute title in some person known to the possessor, or who will doubtless be known. With respect to found treasure when the loser is unknown, it is doubtful whether the finder's title can ever be defeated. He cannot honestly conceal the finding, but he is the ostensible and legal owner of the articles, and may publicly retain them, except as to such things as the statutes have otherwise provided for, until the loser is discovered, which may never happen.
 
 
 82
 1 Stew. at 342.
 
 
 83
 In Warren v. Peppers, plaintiff had purchased a truck from a dealer, signing a conditional sales contract under which legal title remained in the seller until the conditions of the contract had been satisfied. The Alabama Court of Appeals held that the purchaser could maintain an action for conversion of the vehicle. In an early decision on the law of trover, the Alabama Supreme Court held that "(t)he gist of the action is the wrongful conversion, and we think the principle is well settled, that possession alone is sufficient evidence of title to enable the plaintiff to recover in an action of trover, against a wrongdoer, although the title to the chattel may not be in the plaintiff, but in another . . . ." Lowremore v. Berry, 19 Ala. 130 at 131.
 
 
 84
 It remains for the Court to determine the nature of USF & G's interest in the warrants which were forwarded to the IRS in partial satisfaction of its lien against Cherokee for unpaid taxes. It has been said that "(t)o all things, real or personal, once subjected to ownership, title there is and must be. . . . That title may be of several kinds; among them, absolute, conditional, equitable, and legal." Southern Hardware & Supply Co. v. Lester, 166 Ala. 86, 94 & 95, 52 So. 328, 331 (1910). In attempting to determine who has title to the warrants in question, the Court is reminded of the old shell game, in which the object was to determine under which of three shells was the pea. After careful consideration of the facts as they appear in the record and of the applicable law, the Court concludes that, at the time the conversion occurred, USF&G had sufficient title to enable it to maintain this action. Although the issue is not without some doubt, the Court is persuaded by the following factors: (1) under the terms of its bond, upon completion of the contract after Cherokee's default, USF&G was entitled to the balance of the funds remaining in the hands of the state; (2) under the doctrine of subrogation discussed earlier, upon payment of the labor and material claims, USF&G became subrogated to not only the rights of the laborers and materialmen whose claims USF&G had paid, but also to the rights of the State, who also was a creditor; (3) title 9, section 78 and 87 of the Code of Alabama ; (4) the letters from Cherokee to the Highway Department in which Cherokee directed that the Highway Department make future estimates payable jointly to Cherokee and USF&G and that the estimates and retainage be forwarded to USF&G; (5) the letter to the Highway Department from USF&G notifying the State of its claim to the remaining contract balances.
 
 
 85
 1. USF&G's performance bond provides "that upon the failure of the said Cherokee Construction Co., Inc. to promptly and efficiently prosecute said work, in any respect, in accordance with the contract, the above bound United States Fidelity & Guaranty Co. as Surety, shall take charge of said work and complete the contract at their own expense, pursuant to its terms, receiving, however, any balance of the funds in the hands of said State due under said contract." The Court holds that this language operates as an assignment of Cherokee's rights to the remaining contract balances upon Cherokee's default. Although such an assignment may not be sufficient to defeat the IRS's levy for unpaid taxes, see United States v. R. F. Ball Construction Corp., 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958), the Court holds that this assignment and subsequent default by Cherokee, all of which occurred before all but one of the IRS's assessments, were sufficient to vest legal title to the warrants in USF& G's as they were issued to Cherokee by the State. With regard to USF&G's right to possession, it is clear that at the time the conversions[20] took place (i. e., when Bass forwarded the warrants to Allen rather than giving them to USF&G and when Allen sent the warrants to the IRS), the State considered the money due and owing. USF&G was aware of its obligation to pay the labor and material claims. USF&G notified the State that it was paying these claims and it paid the claims. Therefore, USF&G had done all that was required in order that it be entitled to receive the warrants. In addition, USF&G notified the State that the warrants should be paid to USF&G and not to Cherokee. Because both Bass and Allen had notice of USF&G's claim to the funds and because the State had been faced with a similar situation in the past in Alabama v. Bessemer Materials, Inc., supra, Bass and Allen acted at their peril in failing either to give to USF&G the contract balances when due or at least to take steps to resolve the disputed claims to this money. In view of the decision in Alabama v. Bessemer Materials, Inc., neither Bass nor Allen can claim that they were not aware that the surety's interest in the contract balances was superior to that of both the contractor and the IRS. Indeed, as Judge Grooms held in that case, the contractor had no property or right of property in the contract balances. By personally undertaking to determine the rights of the various parties, Bass and Allen must now accept the responsibility for having erred in that determination. By acting in a manner inconsistent with the rights of USF& G, both Bass and Allen have exposed themselves to liability.
 
 
 86
 2. USF&G's property rights in the warrants arise also by virtue of its subrogation rights discussed previously. By fulfilling Cherokee's obligations to the State, USF&G became subrogated to the rights of the State, whose "claim"[21] USF&G has paid. It is clear that, if the State had paid the labor and material claims, it would be entitled to deduct the amounts paid from the contract balances in its possession. Therefore, by USF&G's paying these claims, it became entitled to this money. Although while the money remained in the Highway Department's general fund, it arguably was not sufficiently identifiable to be subject to an action of conversion,[22] upon issuing the warrants to Cherokee, USF&G's rights became perfected. The warrants were identifiable and belonged to USF&G. USF&G also had the right to possess them immediately, having paid the labor and material claims and having notified the State of its claim. Failing to turn over the warrants after demand by USF&G was a conversion. Indeed any action other than giving the warrants to USF&G, or holding them pending settlement of the disputed claims,[23] would be inconsistent with USF&G's title and right of immediate possession, and, thus, a conversion.
 
 
 87
 3. The Code of Alabama, title 9, section 78 provides:
 
 
 88
 A surety who has paid his principal's debt is entitled to a transfer of the original and collateral security which the creditor holds; he has all the rights to realize thereon and to reimburse himself to the same extent as the creditor might have done before the surety paid him, whether paid before or after judgment or decree. He shall be substituted for the creditor and subrogated to all his rights and remedies; in effect, he shall be a purchaser of the debt and all its incidents.
 
 Section 87 of the same title provides:
 
 89
 A surety who has paid the debt of his principal is subrogated both at law and in equity, to all the rights of the creditor, and in a controversy with other creditors, ranks in dignity the same as the creditor whose claim is paid.
 
 
 90
 In Reese v. Mackentepe 224 Ala. 372, 374, 140 So. 550 (1932), an action under what is now section 87, the court held:
 
 
 91
 Inasmuch as the plaintiff was a surety on the paper, and the defendant was the principal debtor, it did not require a transfer of the note to plaintiff to invest him with the legal title, when he paid the note. Eo instanti, upon the payment of the note by the plaintiff, as surety, the title, legal and equitable, passed to, and vested in, the plaintiff, and for all purposes he became the owner, legal and equitable, of the paper, and all collateral security thereto.
 
 
 92
 224 Ala. at 374, 140 So. at 551 (emphasis added). By the same token, upon payment by USF&G of Cherokee's "debts" owed to both the labor and material claimants and to the State, legal and equitable title to the contract balances, including the retainage, passed to USF&G. It is elementary that everyone, including the defendants here, is presumed to know the law. Indeed, Bass and Allen, as public officials entrusted with state funds, are held to higher standard of care than the ordinary citizen. Hometrust Life Insurance Co. v. United States Fidelity & Casualty Co., 298 F.2d 379 (5th Cir. 1962); cf. United States v. Baldridge, 11 F. 552, 556-57 (C.C.A.N.D.Ala.1882). Bass and Allen's failure to apply the applicable law, which they are presumed to know, subjects them to liability in this action.
 
 
 93
 4. By letter dated October 4, 1974, T. E. Gillespie, president of Cherokee, directed the Highway Department to pay "all contract money both earned and to be earned in the future" jointly to USF&G and Cherokee and to send the checks to USF&G. In the October 14, 1974 letter, Cherokee, again acting through its president, directed the Highway Department to "forward all retainage checks arising out of the project to my Surety, the USF&G Co." While there are other letters which contradicted and attempted to rescind these instructions, at a minimum this evidence should have put defendant Bass on notice that Cherokee's interest in the contract funds was at best questionable and that there were other claimants to these funds. Bass purports to recognize these conflicting claims in his transmittal letters to Allen, which letters accompanied the warrants. But forwarding the warrants to Allen in response to the IRS's levy instead of either giving them to their rightful owner, USF&G, or holding them pending resolution of the competing claims was inconsistent with USF&G's title, thereby exposing Bass to liability.
 
 
 94
 5. The final factor playing a significant role in the Court's finding that USF&G has sufficient title to maintain this conversion action is the letter written by the supervisor of USF&G's Claim Department. This letter, the text of which is set out in the margin,[24] put the State on notice of USF&G's claim to the contract balances and the nature and source of USF&G's rights to those funds. The letter instructed that no further payment be made without express approval of USF & G and warned that any action contrary to those instructions would be at the State's peril. In the face of these instructions and this warning, Bass cannot claim that he acted in good faith in turning the warrants over to Allen for forwarding to the IRS. At a minimum, Bass was under a duty to take steps to determine which of the claimants had a superior title to this money. His failure to take even this minimal action now causes him to be subject to tort liability.
 
 
 95
 From the above factors, as well as from other facts appearing in the record, the Court concludes that, at the time Bass issued the warrants and forwarded them to Allen, and at the time that Allen forwarded the warrants to the IRS, USF&G had both sufficient title and the immediate right of possession such that the actions of Bass and Allen in derogation of USF&G's title constitute a conversion of the warrants. It remains for the Court to examine the defenses asserted by Bass and Allen.
 
 
 96
 V. Defenses.
 
 
 97
 Both Bass and Allen attempt to assert a "good faith" defense. In the first place, good faith is not a defense to an action for conversion. "Unlawful dominion over the property of another is a conversion, even though the party may not know the true ownership and act in good faith, where the law charges him with the duty to know." First National Bank v. Morgan, 213 Ala. 125, 128, 104 So. 403 (1925). Bass and Allen counter with the contention that they are entitled to a qualified immunity because of their positions as public officers. In support of this contention, Allen cites four decisions of the United States Supreme Court dealing with the liability of state officials for violation of 42 U.S.C. § 1983.[25] These cases are inapposite. This is not a section 1983 action; neither is it an action under federal law. Rather, Bass and Allen are being sued in their individual capacities, under a state law cause of action, for acts performed in their capacity as public officers. In this situation, the scope of the cause of action and the defenses that may be asserted are determined under state law.
 
 
 98
 Defendant Allen, as treasurer, was under the obligation "to have the custody of and to keep safe all moneys . . . required or permitted by law to be deposited with the state . . . ." Code of Alabama, tit. 55, § 211 (Recomp.1958) (emphasis added). Defendant Bass is charged with the duty to exercise "all the powers, authority, and duties vested in the highway department." Code of Alabama, tit. 23, § 2 (Recomp.1958). Section 15 of title 23 provides in part:
 
 
 99
 The revenue derived by the state from the sale of motor vehicle, trailer and tractor licenses and all other appropriations shall be used for the following purposes ; first, to provide a sinking fund sufficient for the retirement of the said road bonds as they shall mature; second, for the expense of the highway department and for the maintenance of roads and bridges constructed under the provisions of this chapter; third, for the purchase of supplies and material, livestock and machinery, and any balance for the construction of roads and bridges.
 
 
 100
 This provision is mandatory; the only exceptions are those authorized by statute.[26]
 
 
 101
 The standard of care applicable to a public officer entrusted with public monies is high. The "officer is exonerated only when he has observed the highest care, vigilance and diligence to prevent loss." Hometrust Life Insurance Co. v. United States Fidelity & Casualty Co., supra, at 383. The leading case in Alabama is State v. Houston, 78 Ala. 576 (1885), involving the accountability of a tax collector. There the Alabama Supreme Court stated:
 
 
 102
 From the course and character of the legislation, construed on principles of public policy, the only reasonable inference is, that it was the intention to exact of officers charged with collecting, keeping, and paying over the public revenue, the highest care, vigilance and diligence known to the law, such as a very prudent and cautious man exercises in respect to the most important matters.
 
 
 103
 78 Ala. at 585.
 
 
 104
 Both Bass and Allen are charged with the responsibility of keeping public monies. Therefore, the standard of care announced in State v. Houston is applicable to them. The Court concludes that by failing to avail themselves of an interpleader action, or, in the alternative, to correctly determine the proper party to receive the retainage, both have failed to exercise that degree of care placed on them by Alabama law. Whether or not the defendants acted in good faith in performing the actions leading to the conversion of the contract balances is immaterial. National Surety Co. v. State, 219 Ala. 609, 123 So. 202 (1929), cited in Hometrust Life Insurance Co. v. United States Fidelity & Guaranty Co., supra.
 
 
 105
 Bass attempts to rely on the fact that the actions taken in his department were taken by his chief accountant. This is of no moment. The language of the statute is mandatory and specific: "all the powers, authority, and duties vested in the highway department shall be exercised by the highway director." Bass is responsible for the acts of his subordinates just as is any other employer. See Hometrust Life Insurance Co. v. United States Fidelity & Guaranty Co., supra, at 386.
 
 
 106
 Bass implies that he was exercising quasi-judicial authority in turning over the warrants to Allen. The apparent basis for this argument is an alleged lack of statutory authority applicable[27] in the circumstances in which Bass found himself thus requiring him to exercise his judgment in determining the proper action to take with regard to the warrants in question. In support of this proposition, Bass cites Continental Bank & Trust Co. v. Brandon, 297 F.2d 928 (5th Cir. 1962) (applying Alabama law). The flaw in Bass' argument is that Bass' responsibility in this case was clear. Upon default by Cherokee in failing to pay the labor and material claims and the subsequent payment of those claims by USF&G, the law is clear the USF&G became entitled to the retainage. The standard specifications are likewise clear as to when final payment is to be made. And finally, there is no question that as between the IRS and USF&G, USF&G had the superior claim to the retainage. Accordingly, there was no room for the exercise of discretion by Bass. He was under a legal obligation to pay the retainage to USF&G. The duty, therefore, was ministerial and not judicial.[28] Compare Hometrust Life Insurance Co. v. United States Fidelity & Casualty, supra, with, Continental Bank & Trust Co. v. Brandon, supra.
 
 
 107
 Bass raises one final point in his defense. He asserts that USF&G failed to use due diligence by not proceeding under section 7426 of the Internal Revenue Code. That section allows one whose property has been wrongfully levied to bring an action against the United States. This defense by Bass is completely without merit. The action for conversion is one at law, not in equity. Therefore, there is no requirement that USF&G elect the remedy most advantageous either to it or to the defendants.
 
 
 108
 Besides those defenses already discussed, Allen claims that there can be no conversion because USF&G had only a lien on the retainage. This contention misinterprets the nature of USF&G's right. While it is true that USF&G, by paying the labor and material claims, became subrogated to the rights of laborers and materialmen, it is also true that USF&G was subrogated to the rights of the State under the contract. The right of the State in the retainage is more than a lien, it is the right to apply the retainage to completion of the contract, including the right to pay labor and material claims. See Code of Alabama, tit. 9, § 78 (Recomp.1958). As Justice Black held in Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962):
 
 
 109
 We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.
 
 
 110
 371 U.S. at 141, 83 S.Ct. at 237 (emphasis added).
 
 
 111
 Having previously found that USF&G had title to the contract balances and not just an equitable lien, the principles applied in Jordan v. Henderson, 258 Ala. 419, 63 So.2d 379 (1953) and Jordan v. Lindsey, 132 Ala. 567, 31 So. 484 (1902), two cases on which Allen places substantial reliance, are of no help.
 
 VI. Conclusion
 
 112
 By paying the contract balances to the IRS in response to its levy against property owned by Cherokee when Cherokee had no rights in that retainage and by not paying those monies to USF&G when USF & G was entitled to them, defendants Bass and Allen wrongfully exercised dominion and control over property belonging to USF&G. Because the defenses asserted by the defendants have been found to be without merit, Bass and Allen will be ordered to pay to USF&G $11,882.53 plus any interest and costs that may have accrued.
 
 
 113
 Judgment will be entered accordingly.
 
 
 114
 Done, this the 21st day of September, 1977.
 
 
 
 [1]
 The district court opinion describes that payment as having been made under the performance bond
 
 
 [2]
 The retainages were larger than USF&G's claim, amounting to $15,230.08 on March 27, 1974, and accumulating further after that date until August 20, 1975
 
 
 [3]
 The highway department's letter of August 20, 1975, which transmitted the two disputed warrants to the treasurer's office, was signed by Robert W. Pickett, Jr., the chief of that department's accounting division. The letter stated that the action was taken under advice of counsel, by which it meant the department's legal division
 
 
 [4]
 The treasurer's office letter of September 3, 1975, which disbursed the two payment warrants to the IRS, had a signature space for Allen, but the copy in the record does not bear her signature, and the dictation code is "FB/gc," which refers to Frank Barefield, the deputy treasurer. The letter cited an opinion of the state attorney general and contained a notation that a copy was being sent to Pickett in the highway department. See note 3 supra
 
 
 [5]
 The style and text of the complaint referred to "Bass as Highway Director" and "Allen as State Treasurer," but USF&G represented and the district court found that the titles were " 'merely descriptive' " and that the suit was against Bass and Allen only in their individual capacities
 
 
 [6]
 Bass and Allen filed a third party complaint seeking to implead the United States, which the district court dismissed
 
 
 [7]
 We do not follow Ellis v. Zuck, 409 F.Supp. 1151, 1160 (N.D.Ala.1976), aff'd on other grounds, 546 F.2d 643, 644 (5th Cir. 1977), to the extent that it misstates Alabama law on conversion actions for nonidentifiable money
 
 
 [8]
 Bass and Allen rely in part on the argument that an action for conversion does not lie unless USF&G had "exclusive" legal title to the payment warrants and retained funds, and that the IRS had partial title to any amounts in excess of $11,882.53. See Alabama v. Bessemer Materials, Inc., 224 F.Supp. 182, 184 (N.D.Ala.1963); Alabama-Tennessee Natural Gas Co. v. Lehman-Hoge & Scott, 122 F.Supp. 314, 319 (N.D.Ala.1954). See generally 10 Williston on Contracts § 1283 (3d ed. W. Jaeger 1967). The Alabama Supreme Court rejected the argument that a plaintiff claiming conversion must have exclusive or general legal title in Forbes & Carloss v. Plummer, 198 Ala. 162, 166-67, 73 So. 451, 454 (1916). See also Hamilton v. Hamilton, 255 Ala. 284, 289-90, 51 So.2d 13, 20 (1950) (title subject to divestment)
 
 
 [9]
 After meeting a payment bond obligation, a surety might be a subrogee toward a private party's rights in payment balances and retainages, if the government is involved merely as a stakeholder, not as a setoff claimant. See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 139, 141, 83 S.Ct. 232, 236, 237, 9 L.Ed.2d 190 (1962); Henningsen v. United States Fidelity & Guar. Co., 208 U.S. 404, 410, 28 S.Ct. 389, 391, 52 L.Ed. 547 (1908); Maryland Cas. Co. v. Dupree, 223 Ala. 420, 424, 136 So. 811, 813 (1931); Note, Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety, 71 Yale L.J. 1274, 1275-76, 1291-93 (1962). After meeting a performance bond obligation, a surety might be subrogated to the state's rights to contract and retained funds, even against tax setoff claims. Prairie State Nat. Bank v. United States, 164 U.S. 227, 232-33, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896); Alabama v. Bessemer Materials, Inc., 224 F.Supp. at 184
 
 
 [10]
 The Alabama statute for public contract bonds in relevant part is construed consistently with the federal Miller Act, which the cited cases construe. Water Works, Gas & Sewer Bd. of the City of Oneonta, Inc. v. P.A. Buchanan Contracting Co., 294 Ala. 402, 318 So.2d 267 (1975); see Price v. H.L. Coble Constr. Co., 317 F.2d 312, 321 (5th Cir. 1963)
 
 
 [11]
 Ordinarily a contracting party enforces its claim against another private party through an action of debt for a specific sum or assumpsit for damages rather than through an action for conversion. Russell v. The Praetorians, Inc., 248 Ala. at 580, 28 So.2d at 789; Hunnicutt v. Higginbotham, 138 Ala. at 475, 35 So. at 470. Because in most cases the state is immune from suit, USF& G's proper remedy was to enforce its subrogation right through a petition for mandamus to compel specific state officials to discharge their nondiscriminatory duty to pay the amounts due. State Board of Administration v. Roquemore, 218 Ala. 120, 123-24, 117 So. 757, 759 (1928) (mandamus to compel state highway department officer to pay sum due to private seller under executed contract); Alldredge v. Bailey, 29 Ala.App. 44, 45, 191 So. 647, 648, cert. denied, 238 Ala. 441, 191 So. 649 (1939) (mandamus to compel county official to draw warrant to pay amount due under executed employment contract)
 
 
 [12]
 The district court erroneously said, in the midst of its legal discussion, that the state failed to turn over the payment warrants "after demand by USF&G." The record does not disclose any such demand specifically requesting the warrants
 
 
 [13]
 The court in Kolb qualified its holding with the following consideration: "It is true that we have statutes making certain officers liable as for the acts of their assistants and clerks; in such cases the special statute, of course, controls." 201 Ala. at 440, 78 So. at 818. Alabama imposes liability on sheriffs in several specific circumstances, e. g., Ala.Code §§ 36-22-9, 36-22-22, 36-22-23 (1977). Those statutory provisions may modify the general rule of official nonliability for subordinates' actions in some cases involving the sheriff's liability for his deputy's conduct. See, e. g., Harwell v. Morris, 255 Ala. 344, 346, 51 So.2d 511, 512 (1951); National Surety Co. v. Boone, 227 Ala. 599, 603, 151 So. 447, 450 (1933). But see Langis v. Byrne, 222 Ala. 183, 184, 131 So. 444, 445 (1930); Scott v. Ryan, 115 Ala. at 589-90, 22 So. at 285
 
 
 [14]
 Alabama law generally permits a ministerial duty to be delegated and performed by a deputy or assistant. Lucas v. Belcher, 20 Ala.App. 507, 508-09, 103 So. 909, 911, cert. denied, 212 Ala. 597, 103 So. 912 (1925); see Merlette v. State, 100 Ala. 42, 45, 14 So. 562, 563 (1894)
 
 
 [15]
 We also do not reach the issues whether the impleader issue has been properly appealed; whether dismissal of the third party complaint was proper; whether USF&G's claim under the state's rights had precedence over the IRS levy on Cherokee's assets; and whether Bass and Allen enjoy sovereign or qualified immunity under these facts
 
 
 [1]
 What claim, if any, First State Bank of Oxford had to these funds does not appear from the record. However, resolution of this case is not dependent upon determining the nature of the bank's interest
 
 
 [2]
 The text of the letter is set out in footnote 24, infra
 
 
 [3]
 The date of the second assessment is not clear in that the numbers signifying the month have been struck over. While the number appearing most clearly is a "9", thereby signifying September, the assessment was for the period ending September 30, 1974. On both this notice of levy and on the second notice, the dates of the assessments are always three months after the end of the period for which the taxes are assessed. In addition, on the second notice, the date of assessment for taxes for the period ending September 30, 1974, is December 30, 1974. Therefore, the Court concludes that the proper date of assessment in the first notice is December 30, 1974. The fact that, on the first and second levies, the unpaid balance is different for this assessment does not alter this result. A logical explanation is that the taxpayer has made a partial payment or that the government has made a typographical error either in the first or second notice
 
 
 [4]
 The contract between the State and Cherokee and the surety agreement between Cherokee and USF&G include the proposal, specifications, contract and bonds. These are considered as one transaction. As the Alabama Supreme Court has noted in a case factually similar to the one before this Court but proceeding under a different legal theory:
 (T)he contract included the plans and specifications, and the latter, by appropriate reference, included the bond that was given by appellee for the due prosecution and execution of the contract. This was but one transaction; and said undertakings, when duly executed, are considered together, or are necessarily and materially related to the other.
 Citizens' Bank of Guntersville v. Pearson, 217 Ala. 391, 393, 116 So. 350 (1927).
 
 
 [5]
 The performance bond contained the following clause:
 The Proposal, Specifications and the Contract hereinbefore referred to, and the Bond for Payment of Labor, Materials, Feed-stuffs or Supplies executed under the provisions of Title 50, Section 16, Code of Alabama, as amended, Recompiled 1958, are made a part of this obligation and this instrument is to be construed in connection therewith. (Emphasis added).
 The material and labor bond contained a similar clause:
 The proposal, Specifications and the Contract hereinbefore referred to, and the Bond for Performance Of The Work executed under the provisions of Title 50, Section 16, Code of Alabama 1940, Recompiled 1958, are made a part of this obligation and this instrument is to be construed in connection therewith. (Emphasis added).
 
 
 [6]
 Section 9.07 (Emphasis added). The amount to be withheld from each estimate was 7.5% of the amount then due. See also Code of Alabama, Title 23, § 23 (Cum.Supp.1973)
 
 
 [7]
 Section 6331 provides in pertinent part:
 If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cover the expense of the levy) by levy upon all property and right to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.
 (Emphasis added).
 
 
 [8]
 Section 6321 provides:
 If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
 
 
 [9]
 Section 6332 provides in part:
 Except as otherwise provided in subsection (b), any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.
 
 
 [10]
 Section 6322 provides:
 Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.
 
 
 [11]
 Subsection (f) of section 6323 provides that the notice in subsection (a) shall be filed "(i)n the case of personal property, whether tangible or intangible, in one office within the State (or the county, or other governmental subdivision), as designated by the laws of such State, in which the property subject to the lien is situated." Alabama has designated the office for filing notice of tax liens in title 33, section 9 of the Code of Alabama (Recomp.1958):
 The United States, by or through any officer, agent, or representative, may file in the office of the judge of probate, or registrar or recorder of deeds of any county in this state, notice of a lien for any tax on the property of any person under the provisions of section thirty one hundred and eighty six of the revised statutes of the United States as now or hereafter amended.
 In Gordon White Construction Co. v. Southland Investment Co., 521 F.2d 856 (5th Cir. 1975), the Fifth Circuit held that title 33, section 11 of the Code of Alabama met the requirements of section 6323(f) with regard to designation of the place for filing notices of tax liens.
 
 
 [12]
 Section 6332(c)(1)
 
 
 [13]
 Section 6332(c)(2). Section 6332(d) absolves the person surrendering the property from liability to the delinquent taxpayer
 Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made who, upon demand by the Secretary or his delegate, surrenders such property or rights to property (or discharges such obligation) to the Secretary or his delegate (or who pays a liability under subsection (c)(1) shall be discharged from any obligation or liability to the delinquent taxpayer with respect to such property or rights to property arising from such surrender or payment.
 
 
 [14]
 Section 6331(a). With regard to the establishment and period of the lien for taxes, see notes 4 and 6, supra
 
 
 [15]
 The obligation to pay labor and material claims in the Dupree case discussed in text was the same as USF&G's in the present litigation. The Alabama Supreme Court in Dupree stated in regard to the surety's obligation and subrogation rights:
 The surety on Clark's bond as a public contractor under bond, conditioned in compliance with the statute (General Acts, Regular Session, 1927, pp. 37, 38, for the faithful performance of the contract, and to "promptly make payment to all persons supplying him or them with labor, material, feed-stuffs or supplies"), has an equity akin to the doctrine of subrogation, in the sums of money due from the board of education under the contract to the contractor as such, and such superior right to said sums, which is superior to the claim of appellees (who had a knowledge of all facts and of the suretyship) when it took the assignment from Clark to secure repayment of moneys advanced, or to be and which had been loaned to Clark by appellees.
 
 
 [223]
 Ala. 423, 136 So. at 813, citing Prairie State Bank v. United States, supra
 
 
 [16]
 Section 8.12 provides:
 The Contractor and his surety shall be liable for all costs and expenses incurred by the State, in completing the work and also for all liquidated damages in conformity with the terms of the contract. In case the sum of such liquidated damages and the expense so incurred by the State is less than the sum which would have been payable under the contract if it had been completed by the Contractor or his surety, the Contractor or his surety shall be entitled to receive the difference. . . .
 
 
 [17]
 Judge Grooms, in his opinion in Alabama-Tennessee went on to state:
 As to subrogation rights a surety does not stand in the shoes of the debtor (the contractor) whose performance he assured rather he takes the position of the creditor who has been satisfied by the surety.
 
 
 [122]
 F.Supp. at 320. While this Court agrees with this proposition, standing alone it is misleading, for it gives no indication that in the situation where the surety pays labor and material claims there are two creditors the material and labor claimants whose claims the surety pays and the owner who has a right to the performance for which it contracted. In the case sub judice, one of those obligations was that material and labor claims would be paid promptly. Upon Cherokee's default in this regard, the State became a creditor to whom this performance was owed. The satisfaction of this claim by USF&G entitled it to subrogation to the rights of the State as well as to the rights of the laborers and materialmen whom it had paid. See 4 Corbin on Contracts § 901
 
 
 [18]
 This is clear from the fact that the State forwarded the final estimates to the IRS. Under the terms of the contract, the retainage was not to be paid until the work was complete and had been accepted by the State
 
 
 [19]
 See, e. g., Thompson v. Ford Motor Credit Corp., supra ; May v. Draper, 214 Ala. 324, 107 So. 862 (1926)
 
 
 [20]
 The law in Alabama is clear that checks and other types of commercial paper may properly be the subject of an action for conversion. See, e. g., First National Bank v. Montgomery Cotton Manufacturing Co., 211 Ala. 551, 101 So. 186 (1924); Hunnicutt v. Higginbotham, 138 Ala. 472, 35 So. 469 (1903); Donnell v. Thompson, 13 Ala. 440 (1848)
 
 
 [21]
 Claim, as used in text, means the State's right to the promised performance under its contract with Cherokee
 
 
 [22]
 See Hunnicutt v. Higginbotham, supra, 138 Ala. at 475, 35 So. 469
 
 
 [23]
 See Scott Paper Co. v. Navay Cherry Barge Service, Inc. 48 Ala.App. 368, 265 So.2d 150 (1972)
 
 
 [24]
 The text of the letter written by USF&G and addressed to the Highway Department stated:
 We would again like to point out that in connection with Cherokee Construction Company's project we have knowledge of substantial labor and/or material charges against this project. We understand that under the contract you have the right to pay labor and material suppiers (sic ) and also labor and material suppliers certainly have an equitable right to be paid from the contract funds.
 Based upon our right of subrogation to the owners and also the subrogation rights of the labor and material suppliers to the owner, we dirct (sic ) that no payment from funds due Cherokee Construction Company, Inc. be made without the express approval of USF&G as Surety. Any payment made contrary to these instructions are made at the peril of the payor. The right of labor and material suppliers to be paid from these funds is unquestioned and we stand in the position of the labor and material suppliers as surety and we further wish to assure you and Cherokee that the funds coming into our possession will be used only to satisfy outstanding legitimate claims.
 
 
 [25]
 Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Wood v. Strictland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)
 
 
 [26]
 See, e. g., Code of Alabama, tit. 23, § 29 (Recomp.1958) (highway department may purchase buildings, tools, and other equipment when needed in carrying out the department's statutory functions)
 
 
 [27]
 But see Code of Alabama, tit. 9, § 78 (Recomp.1958)
 
 
 [28]
 The leading case on the distinction between ministerial and judicial functions of public officials is Ex parte Thompson, 52 Ala. 98 (1875). There, the court stated:
 It may not always be easy to ascertain the real character of a statutory power intrusted (sic) to a judicial or ministerial officer. When the power is clearly defined and enjoined, does not involve the exercise of discretion or judgment, and no alternative is left to the officer charged with its execution; when he must act without inquiry, and without evidence, and the mode of action is expressly declared, the power is purely ministerial. When, however, the power involves the exercise of judgment and discretion; when it is to be exercised only in an ascertained event and on the concurrence and existence of particular facts, and the officer charged with the execution of the power must determine whether the event has arisen, or the facts exist requiring its exercise, then the power is judicial, or in its nature judicial.52 Ala. at 98-99.